UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

| | |
|---|---|
| IN RE:<br><br>DAVID HOWARD ELOWITZ<br>LESLIE SUSAN ELOWITZ,<br><br>Debtors. | CHAPTER 7<br><br>CASE NO. 11-12803-PGH |

## NATIONSTAR MORTGAGE LLC'S MOTION TO
## REOPEN DEBTORS' BANKRUPTCY CASE AND
## TO COMPEL SURRENDER OF MORTGAGED PROPERTY

Nationstar Mortgage LLC (**Nationstar**), by and through its undersigned counsel and pursuant to 11 U.S.C. §§ 105(a) and 350(b), Rules 5010 and 9024 of the Federal Rules of Bankruptcy Procedure, and Local Rule 5010-1, files this Motion to Reopen Debtors' Bankruptcy Case and to Compel Surrender of Mortgaged Property.  In support thereof, Nationstar states as follows:

### INTRODUCTION

In exchange for a discharge, debtors David Howard Elowitz and Leslie Susan Elowitz (the **Debtors**) swore under penalty of perjury that they intended to surrender their mortgaged property.  Rather than surrender the property, the Debtors have spent the last four years continuously interfering with the foreclosure of the mortgage.  The Debtors' failure to perform their duties under the Bankruptcy Code has resulted in extreme prejudice to Nationstar in the form of excessive and unnecessary interest accrual and litigation, and tax and insurance expenses.  All the while, the Debtors have enjoyed full and obligation-free use of the mortgaged

property.   Nationstar respectfully moves for an order reopening this Chapter 7 bankruptcy proceeding, compelling the Debtors to surrender the mortgaged property, as promised, and for such other relief as is just.

## JURISDICTION & VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. §§ 157(a)(2)(A) and (O).  This Court is the proper venue pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL & PROCEDURAL BACKGROUND

2.      The Debtors executed a promissory note in the principal amount of $523,200.00 in favor of US Mortgage of Florida on July 22, 2005.  The note was fully secured by a mortgage, executed by the Debtors on July 22, 2005 (**the Mortgage**), that encumbers property located at 19723 Brickel Point Dr., Boca Raton, Florida 33498 (**the Property**).   *See* **EXHIBIT A** (Mortgage).

3.      The Debtors defaulted under the Mortgage by failing to make the installment payment due October 2010.  The Debtors have not made a single loan payment in almost five years but have continued to reside in and enjoy the benefit of the Property.

4.      Aurora Loan Services LLC (**Aurora**), then the Debtors' loan servicer, instituted a foreclosure action against the Debtors in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida, styled *Aurora Loan Services LLC v. David Elowitz, et al.,* Case No. 502011CA010307XXXXMB, on July 11, 2011 (the **Foreclosure**).[1]   *See* **EXHIBIT B**

---

[1] Pursuant to Rule 201(d) of the Federal Rules of Evidence, Nationstar respectfully requests that this Court take judicial notice of all papers filed in this proceeding and of any other matters of public record admitted into evidence. *See In re Creative Desperation Inc.*, 415 B.R. 882, 886 (Bankr. S.D. Fla. 2009).

(Foreclosure Docket). The Debtors retained counsel on or before August 16, 2011, and began actively defending against the Foreclosure. *Id.*

5.      The Debtors filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code with this Court on February 1, 2011 (the **Petition**). [ECF No. 1] The Debtors listed the Mortgage on Schedule D and identified their creditor as Aurora. *Id.* The Debtors did not note the claim as contingent, unliquidated or disputed. *Id.* Nor did the Debtors list any claim with respect to the Mortgage on Schedule B. *Id.*

6.      The Debtors went on to indicate on their Individual Statement of Intention that the Property would be "Surrendered". [ECF No. 1, p. 43]

7.      Also on February 1, 2011, the Debtors filed a Declaration Under Penalty of Perjury to Accompany Petitions, Schedules and Statements Filed Electronically, in which they swore that the Schedules and Statements, including the Statement of Intention, were true and correct to the best of their knowledge and belief. [ECF No. 9]

8.      Aurora sought relief from the automatic stay to commence a foreclosure action of the Property on February 21, 2011. [ECF No. 13.] The Debtors did not object to the relief sought so this Court entered an order granting stay relief on March 9, 2011. [ECF No. 22]

9.      Necessarily relying in part on the Debtors' Schedules and sworn intention with respect to the Property, the Trustee abandoned any interest in the Property at the 341 meeting. [ECF No. 16]

10.      This Court entered an order discharging the Debtors on May 2, 2011. [ECF No. 26]

11.      Despite surrendering the Property and obtaining a discharge, the Debtors have actively opposed the Foreclosure. Specifically, they moved to quash service, served discovery,

filed an answer that asserts eleven separate affirmative defenses, a counterclaim and a third-party claim on September 8, 2015. *See* **EXHIBIT C** (Answer, Affirmative Defenses, Counterclaim and Third-Party Claim).

12.     Nationstar, successor to Aurora as the Debtors' loan servicer, was substituted in as party plaintiff in the Foreclosure on June 7, 2013.   Deutsche Bank Trust Company Americas as Trustee for Residential Accredit Loans, Inc. Pass Through Certificates 2005-QO1, was substituted in as party plaintiff in the Foreclosure on December 10, 2014.  Nationstar remains the Debtors' loan servicer.

13.     The direct and intended result of the Debtors acting contrary to their Statement of Intention has been significant delay in Nationstar's attempt to pursue creditor foreclosure rights in state court, and a de facto four-and-a-half-year extension of the Debtors' payment-free residence in the Property.

**LEGAL ARGUMENT**

**A.     Cause exists to reopen this case.**

Bankruptcy Rule 5010 provides, in relevant part, that "[a] case may be reopened on motion of . . . [a] party in interest pursuant to § 350(b) of the Code." Fed. R. Bankr. P. 5010. Section 350(b) provides that "[a] case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause."   11 U.S.C. § 350(b).  It is well-settled that the decision to reopen a case is left to the sound discretion of the bankruptcy court.  *See, e.g., Katz v. I.A. Alliance Corp. (In re I. Appel Corp.)*, 300 B.R. 564, 571 (S.D.N.Y. 2003), *aff'd*, 104 Fed. Appx. 199 (2nd Cir. 2004); *In re Rosinski,* 759 F.2d 539, 540–41 (6th Cir. 1985); *see also In re Shondel*, 950 F.2d 1301 (7th Cir. 1991).  "The bankruptcy court . . . base[s] its decision to reopen on the particular circumstances and equities of each particular

case." *In re Mayhugh*, 427 B.R. 549, 552 (Bankr. S.D. Fla. 2010) (citing *In re Apex Oil Company, Inc.*, 406 F. 3d 538, 542 (8th Cir. 2005); *see also In re Case*, 937 F.2d 1014, 1018 (5th Cir. 1991); *see Mass. Dep't of Rev. v. Crocker (In re Crocker)*, 362 B.R. 49, 53 (B.A.P. 1st Cir. 2007) (citation omitted); *Finch v. Coop (In re Finch)*, 378 B.R. 241, 245 (B.A.P. 8th Cir. 2007), *aff'd*, 285 Fed. App'x. 576 (8th Cir. 2010).

The fact that a discharge has been entered and the case administratively closed does not divest this Court of the power to reopen a case. *See Donaldson v. Bernstein*, 104 F.3d 547, 552-54 (3d Cir. 1997); *In re Jordan Mfg. Co., Inc.*, 138 B.R. 30, 35 (Bankr. C.D. Ill. 1992). A bankruptcy case should be reopened when there exists a compelling reason to do so. *See, e.g., In re Mutts*, 131 B.R. 306 (Bankr. E.D. Va. 1991).[2] There is a compelling reason to reopen this case because the Debtors have failed to perform their stated intention with respect to the surrendered Property, and have instead actively opposed Nationstar's enforcement of its *in rem* Property rights.

**B.**    **The Debtors' surrender of the Property prohibits them from interfering with the Foreclosure.**

The Debtors have a statutory duty to perform their clearly stated intent to surrender the Property. Section 521(a) of the Bankruptcy Code states, in pertinent part:

(a) The debtor shall—

* * *

(2) *if an individual debtor's schedule of assets and liabilities includes debts which are secured by property of the estate*—

(A) within thirty days after the date of the filing of a petition under chapter 7 of this title or on or before the date of the meeting of

---

[2] The reopening of a case, by itself, has no independent legal significance and determines nothing with respect to the merits of the case. *See In re David*, 106 B.R. 126, 128 (Bankr. E.D. Mich. 1989). It is merely a ministerial act which allows the court file to be retrieved and reopened to enable the court to receive a new request for relief. *Id.*

creditors, whichever is earlier, or within such additional time as the court, for cause, within such period fixes, *file with the clerk a statement of his intention with respect to the retention or surrender of such property* and, if applicable, specifying that such property is claimed as exempt, that the debtor intends to redeem such property, or that the debtor intends to reaffirm debts secured by such property; and

(B) *within 30 days after the first date set for the meeting of creditors* under section 341(a), or within such additional time as the court, for cause, within such 30-day period fixes, *perform his intention with respect to such property*, as specified by subparagraph (A) of this paragraph[.]

11 U.S.C. § 521(a)(2)(B) (emphasis added).

A chapter 7 debtor has three options with respect to property securing a debt. The debtor may redeem the property by paying the debt in full, reaffirm his agreement to repay the debt, or surrender the property. *In re Steinberg*, 447 B.R. 355, 357 (Bankr. S.D. Fla. 2011) (J. Kimball); *In re Plummer*, 513 B.R. 135, 141 (Bankr. M.D. Fla. 2014) (J. Jennemann).

If the debtor does not redeem or reaffirm the debt, § 521(a)(2) requires the debtor to surrender the collateral to the secured creditor. *See Taylor v. AGE Federal Credit Union (In re Taylor)*, 3 F. 3d 1512, 1516 (11th Cir. 1993) (to retain property, debtor must reaffirm the debt or redeem the property; "Allowing a debtor to retain [collateral] property without reaffirming or redeeming gives the debtor not a 'fresh start' but a 'head start' since the debtor effectively converts his secured obligation from recourse to nonrecourse with no downside risk for failing to maintain or insure the lender's collateral.") *In re Harris*, 226 B.R. 924, 926 (Bankr. S.D. Fla. 1998) (debtor's "performance of his stated intention is mandatory").

"'[S]urrender means that Debtor cannot thereafter take any overt action to defend or impede the foreclosure." *In re Calzadilla*, No. 14-11318, 2015 WL 3791446, at *2-3 (Bankr. S.D. Fla. June 16, 2015); *see also In re Metzler*, 530 B.R. 894, 899 (Bankr. M.D. Fla. 2015)

("[T]his Court concludes that relinquishing property and making it available to the secured creditor—i.e., "surrendering" the property—means not taking an overt act to prevent the secured creditor from foreclosing its interest in the secured property."). In *In re Failla*, 529 B.R. 786 (S.D. Fla. 2014), this Court found that bankruptcy and state court double-dealing by a debtor is prohibited and potentially fraudulent. In *Failla*, like here, the debtor filed a Chapter 7 voluntary petition, declared under penalty of perjury his intention to surrender the mortgaged property, and obtained a discharge. *See In re Failla*, 529 B.R. at 788. But, in direct contravention of his sworn statement, the debtor retained possession and title to the property and opposed the mortgagee's foreclosure action in state court. *Id.* This Court concluded that:

> [T]he Debtor's active defense of the foreclosure action in the State Court does not comport with the definition of "surrender" for purposes of the Bankruptcy Code. Therefore, the Debtor is not permitted to defend or oppose the foreclosure and/or sale of the Property in the State Court because he swore under oath in this Court that he intended to surrender the Property and benefited from this declaration.

*Id.* at 793. Your Honor then proceeded to enter an order: (1) granting the mortgagee's motion to compel surrender; (2) commanding the debtor to "cease all defense and/or opposition related to the foreclosure and/or sale of the Property in the State Court"; and (3) threatening to vacate the debtor's discharge if he failed to comply with the order. *Id.*

In reaching the decision in *Failla*, this Court was persuaded by the position taken by Judge Kimball in *In re Cheryl L. Troutt*. *See In re Failla*, 529 B.R. at 791-92 (citing *In re Cheryl L. Troutt*, Case No. 13–39869–BKC–EPK and *In re Luther Burnett, Jr.*, Case No. 13–12274– BKC–MGW). Judge Kimball stated as follows:

> [T]hat if the debtor files a bankruptcy case, and takes action in the case that shows an intent to surrender the property, that recognizes the lien and its validity, and gets an advantage through doing that, and then obtains a discharge, but the truth is that the debtor had no intention of giving up the property, and has filed the case in

part for strategic reasons, that a discharge was obtained through fraud and should
be revoked.

*In re Failla* at 791 (citing *In re Cheryl L. Troutt* at ECF No. 31, Tr. p. 7, line 214). Judge
Kimball went on to add that "[i]f the debtor persists in refusing to surrender the property then the
only conclusion the Court could reach is that the debtor obtained the discharge based on fraud,
and so the discharge should be revoked." *In re Failla* at 792 (citing *In re Cheryl L. Troutt* at
ECF No. 31, Tr. p. 12, line 25; p. 14, lines 1-16; p. 15, lines 5-7). The Debtors' actions in
contesting the Foreclosure are contrary to their sworn intention and could be considered
fraudulent behavior. *See In re Failla* at 793 ("The Debtor's refusal to effectively surrender the
Property to [the mortgagee] could be considered [] a fraud on the Court.").

The record in the foreclosure action shows the Debtors have ignored their statement of
intentions by contesting the Foreclosure. The last payment on the secured loan was on October
16, 2009. Nationstar, and previously Aurora, have advanced property taxes and hazard insurance
to protect the property. The Debtors received a discharge yet still enjoy the use and benefits of
the Property, to Nationstar's detriment and in violation of their obligations.

The Debtors should be held to their obligations and surrender the Property. Otherwise,
the Debtors will be rewarded for manipulating the bankruptcy system and state court system to
gain improper benefits at the expense of their creditors. Such an outcome would permit "a
breeding ground for contemptuous refusal to perform the duties required by the Bankruptcy
Code." *In re Harris,* 226 B.R. at 925.

**WHEREFORE**, Nationstar respectfully requests the Court enter an order (i) reopening
this bankruptcy case; (ii) granting Nationstar's motion to compel surrender; (iii) requiring the
Debtors to immediately surrender the Property by ceasing all actions to defend or impede the

Foreclosure, including, but not necessarily limited to, withdrawing, with prejudice, their affirmative defenses, counterclaim, third-party claim and any other paper filed in the Foreclosure that opposes, defends, contests, or otherwise denies any material allegation of Nationstar's complaint; (iv) vacating the Debtors' discharge if they fail to comply with the order; and (v) awarding any further relief this Court deems just and proper under the circumstances.

Dated:  October 8, 2015

Respectfully submitted,

By:    */s/ Andrea S. Hartley*
Andrea S. Hartley
Florida Bar No. 864234
Email: andrea.hartley@akerman.com
**AKERMAN LLP**
One Southeast Third Avenue
25th Floor
Miami, Florida 33131-1714
Telephone:  (305) 374-5600
Facsimile:  (305) 374-5095

*Counsel for Nationstar Mortgage LLC*

<u>**CERTIFICATE OF SERVICE**</u>

*I HEREBY CERTIFY* that on October 8, 2015, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that a true and correct copy of the foregoing document is being served this day by transmission of Notices of Electronic Filing generated by CM/ECF on those parties registered to receive electronic notices of filing in this case and/or via U.S. Mail as indicated on the attached Service List.

By:  /s/ *Andrea S. Hartley* _____
       Andrea S. Hartley

## SERVICE LIST

**11-12803-PGH Notice will be electronically mailed via CM/ECF to:**

Deborah Menotte
menottetrustee@gmail.com, FL43@ecfcbis.com

Office of the US Trustee
USTPRegion21.MM.ECF@usdoj.gov

Matthew H Scott on behalf of Creditor Vt Inc
mhs@trippscott.com, bankruptcy@trippscott.com

Jason A. Weber on behalf of Creditor Aurora Loan Services, LLC
jweber@kahaneandassociates.com, wsambolin@kahaneandassociates.com,
jbuchanan@kahaneandassociates.com

Stuart A Young on behalf of Debtor David Elowitz
syoung81@bellsouth.net

**11-12803-PGH Notice via U.S. Mail to:**

Anila Rasul on behalf of Creditor Aurora Loan Services, LLC
8201 Peters Rd # 3000
Plantation, FL 33324

ALL PARTIES APPEARING ON THE ATTACHED COURT'S MAILING MATRIX

Label Matrix for local noticing
113C-9
Case 11-12803-PGH
Southern District of Florida
West Palm Beach
Thu Oct  8 10:59:51 EDT 2015

Aurora Loan Services, LLC
8201 Peters Rd
Suite 3000
Plantation, FL 33324-3292

Vt Inc
c/o Matthew H. Scott, Esq.
TRIPP SCOTT, PA
110 SE 6th Street, 15th Floor
Ft Lauderdale, FL 33301-5004

Al Hendrickson Toyota
5201 W Sample Rd
Pompano Beach, FL 33073-3410

American Express
POB 360002
Fort Lauderdale, FL 33336-0002

American Express
c/o Becket and Lee LLP
POB 3001
Malvern, PA 19355-0701

Aurora Loan Services
Attn: Bankruptcy Dept.
POB 1706
Scottsbluff, NE 69363-1706

Bank Of America
Attn: Bankruptcy NC4-105-02-99
POB 26012
Greensboro, NC 27420-6012

Bank Of America
POB 17054
Wilmington, DE 19850-7054

Boca Isles South Homeowner's Assoc.
151 Ocean Key Drive
Boca Raton, FL 33498

Boca Isles South Homeowner's Assoc.
19951 Ocean Key Drive
Boca Raton, FL 33498-4539

Capital One
POB 71093
Charlotte, NC 28272-1093

Capital One, N.A
c/o American Infosource
POB 54529
Oklahoma City, OK 73154-1529

Chase
201 N. Walnut St. /De1-1027
Wilmington, DE 19801-2901

Chase
c/o Creditors Interchange
POB 2270
Buffalo, NY 14240-2270

CitiFinancial
POB 183041
Columbus, OH 43218-3041

Citibank
c/o Home Depot Credit Services
Processing Center
Des Moines, IA 50364-0500

Citibank
c/o Northland Group, Inc.
POB 390905
Minneapolis, MN 55439-0905

(p)CITIBANK
PO BOX 790034
ST LOUIS MO 63179-0034

Citifinancial Retail Services
NTSB-2320
6801 Colwell Blvd
Irving, TX 75039-3198

Discover
POB 71084
Charlotte, NC 28272-1084

Discover Financial Services
Attention: Bankruptcy Department
POB 3025
New Albany, OH 43054-3025

(p)US BANK
PO BOX 5229
CINCINNATI OH 45201-5229

GEMB/GE Money
Attn: Bankruptcy
POB 103106
Roswell, GA 30076-9106

GEMB/GE Money
POB 530913
Atlanta, GA 30353-0913

GEMB/GE Money
c/o NCC Business Services, Inc.
9428 Baymeadows Road, Ste. 200
Jacksonville, FL 32256-7912

HSBC
c/o American Coradius International, LLC
2420 Sweet Home Road, Ste. 150
Buffalo, NY 14228-2244

HSBC/MS
POB 3425
Buffalo, NY 14240-3425

Infiniti Financial Services
POB 660360
Dallas, TX 75266-0360

Jason Ross Elowitz
19723 Brickel Point Drive
Boca Raton, FL 33498-4503

Lakeside Development Corp
777 East Atlantic Avenue
Suite C2
PMB253
Delray Beach, FL 33483-5352

Lakeside Development Corp
777 East Atlantic Avenue, Ste. C2
Delray Beach, FL 33483-5352

LoveCypher, Inc.
19723 Brickel Point Drive
Boca Raton, FL 33498-4503


Nancy Hall
11391 Manatee Terrace
Lake Worth, FL 33449-5819

(p)NISSAN MOTOR ACCEPTANCE CORPORATION
LOSS RECOVERY
PO BOX 660366
DALLAS TX 75266-0366

Office of the US Trustee
51 S.W. 1st Ave.
Suite 1204
Miami, FL 33130-1614


PRSM/CBSD
Citi Mastercard
Processing Center
Des Moines, IA 50364-0001

PRSM/CBSD
POB 6497
Sioux Falls, SD 57117-6497

Reef America REIT 11 Corp J
75 Remittance Drive
Suite 1974
Chicago, IL 60675-1974


Regions Bank
POB 1984
Birmingham, AL 35201-1984

S.J. Russano
10318 178th Ct. S
Boca Raton, FL 33498-1651

Sears/CBSD
701 East 60th St N
Sioux Falls, SD 57104-0432


Sears/CBSD
POB 183082
Columbus, OH 43218-3082

Sears/CBSD
c/o Associated Recovery Services
POB 469046
Escondido, CA 92046-9046

Suntrust Bank
POB 79079
Baltimore, MD 21279-0079


Tax Collector, Palm Beach County
POB 3715
West Palm Beach, FL 33402-3715

Wells Fargo
POB 96074
Charlotte, NC 28296-0074

West Boca Medical Center
c/o Central Financial Control
Attn: Bankruptcy
POB 66044
Anaheim, CA 92816-6044


World Omni Financial
6150 Omni Park Dr
Mobile, AL 36609-5195

David Howard Elowitz
19723 Brickel Point Dr.
Boca Raton, FL 33498-4503

Deborah Menotte
POB 211087
West Palm Beach, FL 33421-1087


Leslie Susan Elowitz
19723 Brickel Point Dr.
Boca Raton, FL 33498-4503

Stuart A Young Esq
1860 Forest Hill Blvd. #201
West Palm Beach, FL 33406-6086




The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).


Citibank USA
Attn.: Centralized  Bankruptcy
POB 20363
Kansas City, MO 64195

Firstar
c/o US Bank Bankruptcy Dept
POB 5229
Cincinnati, OH 45201

Nissan-Infiniti
Attn: Bankruptcy
8900 Freeport Parkway
Irving, TX 75063

(d)Nissan-Infiniti LT
8900 Freeport Parkway
Irving, TX 75063-2438


The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.


(u)West Palm Beach                    (d)American Express              (d)Capital One, N.A.
                                      POB 360002                      c/o American Infosource
                                      Fort Lauderdale, FL 33336-0002  POB 54529
                                                                      Oklahoma City, OK 73154-1529


End of Label Matrix
Mailable recipients    52
Bypassed recipients     3
Total                  55

# EXHIBIT A

CFN 20050474379
OR BK 18993 PG 1793
RECORDED 07/29/2005 15:49:17
Palm Beach County, Florida
AMT 523,200.00
Deed Doc 1,831.20
Intang 1,046.40
Sharon R. Bock,CLERK & COMPTROLLER
Pgs 1793 - 1809; (17pgs)

Return to: HOMECOMINGS FINANCIAL NETWORK, INC.
ONE MERIDIAN CROSSING, #100
MINNEAPOLIS, MN  55423

Prepared under the supervision of:
Michael L. Riddle
Middleberg, Riddle & Gianna
717 N. Harwood, Suite 2400
Dallas, TX  75201

13/7C

THE TITLE COMPANY
Of SOUTH FLORIDA
8301 NW 6TH WAY, SUITE 1200
FT. LAUDERDALE, FL 33309
(954) 772-8199

Folio:  00-41-47-12-19-002-0070

| | |
|---|---|
| Loan No:  ████403-2 | [Space Above This Line For Recording Data] | Data ID:  237 |
| Borrower:  DAVID ELOWITZ | | |

## MORTGAGE

MIN:  ████40326

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21.  Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "**Security Instrument**" means this document, which is dated July 22, 2005, together with all Riders to this document.

(B) "**Borrower**" is DAVID ELOWITZ AND LESLIE ELOWITZ, HUSBAND AND WIFE.  Borrower is the mortgagor under this Security Instrument.
WHOSE ADDRESS IS: 19723 BRICKEL POINT DR.,BOCA RATON,FL 33498
(C) "**MERS**" is Mortgage Electronic Registration Systems, Inc.  MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.  MERS is the mortgagee under this Security Instrument.  MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) "**Lender**" is US MORTGAGE OF FLORIDA.  Lender isa Corporation organized and existing under the laws of the State of FLORIDA.  Lender's address is 2230 N. FEDERAL HIGHWAY, BOCA RATON, FL 33431.

(E) "**Note**" means the promissory note signed by Borrower and dated July 22, 2005.  The Note states that Borrower owes Lender FIVE HUNDRED TWENTY-THREE THOUSAND TWO HUNDRED and NO/100-----Dollars (U.S. $ 523,200.00) plus interest.  Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than August 1, 2035.

(F) "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**FLORIDA** - Single Family - Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**
Form 3010    1/01                                                    (Page 1 of 11 Pages)

EXHIBIT

tabbles

A

Loan No: ███████403-2                                         Data ID: 237

(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider     ☐ Condominium Rider        ☐ Second Home Rider
☐ Balloon Rider             ☒ Planned Unit Development Rider
☐ 1-4 Family Rider        ☐ Biweekly Payment Rider
☐ Other(s) [specify]

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) **"Escrow Items"** means those items that are described in Section 3.

(M) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the County of PALM BEACH:

LOT 7, BLOCK 2, OF BOCA ISLES SOUTH PHASE 5B, ACCORDING TO THE PLAT THEREOF RECORDED IN PLATBOOK 73, PAGE 10, OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

**FLORIDA** - Single Family - Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**
                        Form 3010    1/01    *(Page 2 of 11 Pages)*

Loan No:      403-2                                                     Data ID: 237

which currently has the address of 19723 BRICKEL POINT,
                                                    [Street]

BOCA RATON, FLORIDA                               33498          ("Property Address"):
[City]                                          [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**FLORIDA** - Single Family - Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**

Form 3010    1/01    (Page 3 of 11 Pages)

Loan No:        403-2                                                         Data ID:  237

    **3.  Funds for Escrow Items.**  Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10.  These items are called "Escrow Items."  At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item.  Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section.  Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items.  Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time.  Any such waiver may only be in writing.  In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.  Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9.  If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount.  Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.
    Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA.  Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.
    The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank.  Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA.  Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds.  Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds.  Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.
    If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA.  If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments.  If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.
    Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.
    **4.  Charges; Liens.**  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.  To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.
    Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien.  Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.
    Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**FLORIDA** - Single Family - Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**
                                 Form 3010    1/01   *(Page 4 of 11 Pages)*

Loan No: ████403-2                                                      Data ID: 237

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**FLORIDA** - Single Family - Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**

Form 3010    1/01    (Page 5 of 11 Pages)

Loan No:  ████403-2                                                        Data ID:  237

7. **Preservation, Maintenance and Protection of the Property; Inspections.**  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition.  Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage.  If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property.  If it has reasonable cause, Lender may inspect the interior of the improvements on the Property.  Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.**  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.  Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.  Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding.  Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.  Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so.  It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease.  If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.**  If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect.  If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender.  If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect.  Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance.  Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve.  Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance.  If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law.  Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

**FLORIDA** - Single Family - Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**
                                                                    Form 3010    1/01    (Page 6 of 11 Pages)

Loan No:           403-2                                                    Data ID:  237

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11.  Assignment of Miscellaneous Proceeds; Forfeiture.  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

**FLORIDA** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010    1/01    (Page 7 of 11 Pages)

Loan No:       403-2                                                    Data ID:  237

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**FLORIDA** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010    1/01    (Page 8 of 11 Pages)

Loan No: ████403-2                                                      Data ID: 237

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

**FLORIDA** - Single Family - Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**
                                          Form 3010    1/01    *(Page 9 of 11 Pages)*

Loan No: ████403-2                                            Data ID: 237

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Attorneys' Fees. As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

25. Jury Trial Waiver. The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

**FLORIDA** - Single Family - Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**
Form 3010    1/01    (Page 10 of 11 Pages)

Loan No: ████403-2                                                    Data ID:  237

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____                          _____
_____                          Heather Hamilton Witness - Printed Name
Julie Hall Witness - Printed Name

                                                         _____(Seal)
                                                         DAVID ELOWITZ —Borrower

                                                         _____(Seal)
                                                         LESLIE ELOWITZ —Borrower

_____ [Space Below This Line For Acknowledgment] _____

State of FLORIDA          §
County of BROWARD         §

The foregoing instrument was acknowledged before me this  22nd  day of  July  ,
20 05  , by
DAVID ELOWITZ AND LESLIE ELOWITZ
who [strike the following that does not apply] are personally known to me/have produced
drivers license as identification.

                                                         _____ Notary Public
                                                         Julie Hall

Julie Ann Hall
My Commission DD236701
Expires July 30, 2007                                    (Name of person taking acknowledgment Typed,
                                                         Printed or Stamped)

My commission expires:  7/30/07

FLORIDA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
                                    Form 3010    1/01    (Page 11 of 11 Pages)

Loan No:     ████403-2
Borrower:  DAVID ELOWITZ

Data ID:  237

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this 22nd day of July, 2005, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to US MORTGAGE OF FLORIDA (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

19723 BRICKEL POINT
BOCA RATON, FLORIDA  33498
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in

DECLARATIONS AND COVENANTS

(the "Declaration").  The Property is a part of a planned unit development known as

BOCA ISLES SOUTH
[Name of Planned Unit Development]

(the "PUD").  The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS.  In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A.  PUD Obligations.  Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents.  The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association.  Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

B.  Property Insurance.  So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender.  Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

C.  Public Liability Insurance.  Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

MULTISTATE PUD RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3150    1/01
(Page 1 of 2 Pages)

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

.......................................................(Seal)
DAVID ELOWITZ —Borrower

.......................................................(Seal)
LESLIE ELOWITZ — Borrower

MULTISTATE PUD RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3150   1/01
(Page 2 of 2 Pages)

Loan No:  ████████403-2
Borrower: DAVID ELOWITZ

Data ID:  237

# ADJUSTABLE RATE RIDER

THIS ADJUSTABLE RATE RIDER is made this 22nd day of July, 2005, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to US MORTGAGE OF FLORIDA ("Lender") of the same date and covering the property described in the Security Instrument and located at:

19723 BRICKEL POINT
BOCA RATON, FLORIDA  33498
[Property Address]

THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THE NOTE.

ADDITIONAL COVENANTS.  In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

2.    INTEREST
(A) Interest Rate
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 1.000 %. The interest rate I will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.
(B) Interest Rate Change Dates
The interest rate I will pay may change on the first day of September, 2005, and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date.
(C) Interest Rate Limit
My interest rate will never be greater than 9.9500 %.
(D) Index
Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the Twelve-Month Average of monthly yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

MULTISTATE ADJUSTABLE RATE RIDER - 12-Month Average of Monthly Average Treasury Yields Index
Modified by Middleberg, Riddle & Gianna            Form 3184 1/01    (Page 1 of 4 Pages)

Loan No: ██████403-2                                          Data ID: 237

**(E)  Calculation of Interest Rate Changes**
Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE and 45/100 percentage points (3.450 %) to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  Subject to the limit stated in 2(C) above, this rounded amount will be my new interest rate until the next Interest Rate Change Date.

**3.    PAYMENTS**
**(A)  Time and Place of Payments**
I will pay principal and interest by making a payment every month.
I will make my monthly payments on the first day of each month beginning on **September 1, 2005**.  I will make these payments every month until I have paid all the principal and interest and any other charges described below that I may owe under this Note.  Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal.  If, on **August 1, 2035**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at 2230 N. FEDERAL HIGHWAY, BOCA RATON, FL 33431, or at a different place if required by the Note Holder.
**(B)  Amount of My Initial Monthly Payments**
Each month of my initial monthly payments will be in the amount of U.S. $ **1,682.82**.  This amount may change.
**(C)  Payment Change Dates**
My monthly payment may change as required by Section 3(D) below beginning on the first day of **September, 2006**, and on that day every 12th month thereafter.  Each of these dates is called a "Payment Change Date."  My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment.
I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.
**(D)  Calculation of Monthly Payment Changes**
Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date.  The result of this calculation is called the "Full Payment."  Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new monthly payment will be in the amount of the Full Payment, except that my new monthly payment will be limited to an amount that will not be more than 7.50% greater than the amount of my last monthly payment due before the Payment Change Date.
**(E)  Additions to My Unpaid Principal**
My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments.  If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal.  The Note Holder also will add interest on the amount of this difference to my unpaid principal each month.  The interest rate on the interest added to Principal will be the rate required by Section 2 above.

Form 3184 1/01    *(Page 2 of 4 Pages)*

Loan No: ████403-2                                                                 Data ID: 237

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**
My unpaid principal can never exceed a maximum amount equal to 115% of the Principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid principal under Section 3(E) above could cause my unpaid principal to exceed that maximum amount when interest rates increase. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount that would be sufficient to repay my then unpaid principal in full on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month.

**(G) Required Full Payment**
On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I also will begin paying the Full Payment as my monthly payment on the final Payment Change Date.

**4.   NOTICE OF CHANGES**
The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Uniform Covenant 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any interest in it is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Form 3184 1/01   (Page 3 of 4 Pages)

Loan No: ███403-2                                            Data ID: 237

By Signing Below, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

..................................................................................................... (Seal)
DAVID ELOWITZ —Borrower

..................................................................................................... (Seal)
LESLIE ELOWITZ —Borrower

Form 3184  1/01   *(Page 4 of 4 Pages)*

# EXHIBIT B

## Report Selection Criteria

**Case ID:**  502011CA010307XXXXMB
**Docket Start Date:**
**Docket Ending Date:**

## Case Description

**Case ID:**       502011CA010307XXXXMB
**Case Caption:**  AURORA LOAN SERVICES LLC V DAVID ELOWITZ
**Division:**      AE - GILLEN
**Filing Date:**   Monday , July 11th, 2011
**Court:**         CA - CIRCUIT CIVIL
**Location:**      MB - MAIN BRANCH
**Jury:**          N-Non Jury
**Type:**          H3 - HR FORECLOSURE => $250K
**Status:**        PE - PENDING

## Related Cases

*No related cases were found.*

## Case Event Schedule

*No case events were found.*

## Case Parties

| Seq # | Assoc | Expn Date | Type | ID | Name | | |
|---|---|---|---|---|---|---|---|
| 1 | | 07-JUN-2013 | PLAINTIFF | @2682817 | **AURORA LOAN SERVICES LLC** | **Aliases:** | *none* |
| 2 | 21 | | ATTORNEY | 0070745 | **SPORTSCHUETZ, TINA** | **Aliases:** | *none* |
| 3 | 10 | | DEFENDANT | @2682818 | **ELOWITZ, DAVID** | **Aliases:** | *none* |
| 4 | 11 | | DEFENDANT | @2682819 | **ELOWITZ, LESLIE** | | |

EXHIBIT

tables'  B

| | | | | | | Aliases: | |
|---|---|---|---|---|---|---|---|
| 5 | | | DEFENDANT | @2682814 | **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC** | **Aliases:** | *none* |
| 6 | | | DEFENDANT | @2682820 | **BOCA ISLES PROPERTY OWNERS ASSOCIATION INC** | **Aliases:** | *none* |
| 7 | | | DEFENDANT | @2682821 | **BOCA ISLES SOUTH PROPERTY OWNERS ASSOCIATION INC** | **Aliases:** | *none* |
| 8 | 04-OCT-2012 | | DEFENDANT | @2682822 | **UNKNOWN PERSONS IN POSSESSION OF THE SUBJECT PROPERTY** | **Aliases:** | *none* |
| 9 | 27-MAY-2015 | | JUDGE | AW | **BLANC, JUDGE PETER D** | **Aliases:** | *none* |
| 10 | 3 | | ATTORNEY | 0044466 | **GOLANT , ESQ, MARGERY E** | **Aliases:** | *none* |
| 11 | 4 | | ATTORNEY | 0044466 | **GOLANT , ESQ, MARGERY E** | **Aliases:** | *none* |
| 13 | | 24-MAR-2014 | ATTORNEY | 0011474 | **WILSON, STEPHEN** | **Aliases:** | *none* |
| 14 | | 09-DEC-2014 | PLAINTIFF | @3256219 | **NATIONSTAR MORTGAGE LLC** | **Aliases:** | *none* |
| 15 | 21 | | ATTORNEY | 0013442 | **ELDER, DENISE** | **Aliases:** | *none* |

| 16 | | ATTORNEY | 0459320 | BASSETT, RICHARD W | Aliases: | none |
| 17 | 21 | ATTORNEY | 011965 | KELLER, EMMA BRAUN | Aliases: | none |
| 18 | 21 | ATTORNEY | 0092137 | WERBER ESQ, BENJAMIN K | Aliases: | none |
| 19 | 21 | ATTORNEY | 0126004 | HORNACK, JOHN C | Aliases: | none |
| 21 | | PLAINTIFF | @3576437 | DEUTSCHE BANK TRUST COMPANY AMERICAS | Aliases: | none |
| 22 | | JUDGE | AE | GILLEN, JUDGE JEFFREY DANA | Aliases: | none |
| 23 | 21 | ATTORNEY | 0064357 | LEVINE , ESQ., ERIC M | Aliases: | none |

## Docket Entries

| Docket Number | Docket Type | Book and Page No. | Attached To: |
|---|---|---|---|
| | 00000 - ADDITIONAL COMMENTS | | |
| Filing Date: | 11-JUL-2011 | | |
| Filing Party: | | | |
| Disposition Amount: | | | |
| Docket Text: | *none.* | | |
| | PE - PENDING | | |
| Filing Date: | 11-JUL-2011 | | |
| Filing Party: | | | |

| | | | |
|---|---|---|---|
| **Disposition Amount:** | | | |
| **Docket Text:** | *none.* | | |
| | 800F3 - CAFF => $250K | | |
| **Filing Date:** | 11-JUL-2011 | | |
| **Filing Party:** | AURORA LOAN SERVICES LLC, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | *none.* | | |
| | 0LISP - FEE/LIS PENDENS ($5.60) | | |
| **Filing Date:** | 11-JUL-2011 | | |
| **Filing Party:** | AURORA LOAN SERVICES LLC, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | *none.* | | |
| 1 | CMP - COMPLAINT | | |
| **Filing Date:** | 11-JUL-2011 | | |
| **Filing Party:** | AURORA LOAN SERVICES LLC, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | *none.* | | |
| 2 | LISP - LIS PENDENS | Book 024631 - Page 01859 | |
| **Filing Date:** | 11-JUL-2011 | | |
| **Filing Party:** | AURORA LOAN SERVICES LLC, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | *none.* | | |
| 3 | CCS - CIVIL COVER SHEET | | |
| **Filing Date:** | 11-JUL-2011 | | |
| **Filing Party:** | AURORA LOAN SERVICES LLC, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | *none.* | | |
| 4 | SCLM - STATEMENT OF CLAIM | | |
| **Filing Date:** | 11-JUL-2011 | | |
| **Filing Party:** | AURORA LOAN SERVICES LLC, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | FORECLOSURE | | |
| 5 | CRT - CERTIFICATE | | |

| | | | |
|---|---|---|---|
| **Filing Date:** | 11-JUL-2011 | | |
| **Filing Party:** | AURORA LOAN SERVICES LLC, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | FORM A | | |
| 6 | CPY - COPY | | |
| **Filing Date:** | 11-JUL-2011 | | |
| **Filing Party:** | AURORA LOAN SERVICES LLC, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | OF CHECK FOR MEDIATION FEE | | |
| 7 | SMIS - SUMMONS ISSUED | | |
| **Filing Date:** | 11-JUL-2011 | | |
| **Filing Party:** | ELOWITZ, DAVID | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | SM-11-063869 | | |
| 8 | SMIS - SUMMONS ISSUED | | |
| **Filing Date:** | 11-JUL-2011 | | |
| **Filing Party:** | ELOWITZ, LESLIE | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | SM-11-063870 | | |
| 9 | SMIS - SUMMONS ISSUED | | |
| **Filing Date:** | 11-JUL-2011 | | |
| **Filing Party:** | BOCA ISLES SOUTH PROPERTY OWNERS ASSOCIATION INC, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | SM-11-063871 | | |
| 10 | SMIS - SUMMONS ISSUED | | |
| **Filing Date:** | 11-JUL-2011 | | |
| **Filing Party:** | BOCA ISLES PROPERTY OWNERS ASSOCIATION INC, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | SM-11-063872 | | |
| 11 | SMIS - SUMMONS ISSUED | | |
| **Filing Date:** | 11-JUL-2011 | | |
| **Filing Party:** | MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | SM-11-063873 | | |

| 12 | SMIS - SUMMONS ISSUED | | |
|---|---|---|---|
| **Filing Date:** | 11-JUL-2011 | | |
| **Filing Party:** | UNKNOWN PERSONS IN POSSESSION OF THE SUBJECT PROPERTY, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | SM-11-063874 | | |
| | RCPT - RECEIPT FOR PAYMENT | | |
| **Filing Date:** | 13-JUL-2011 | | |
| **Filing Party:** | AURORA LOAN SERVICES LLC, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | A Payment of -$1,974.10 was made on receipt CAMB578860. | | |
| | SRTN - SERVICE RETURN (ATTACHED) | | |
| **Filing Date:** | 03-AUG-2011 | | |
| **Filing Party:** | MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | SERVED 7/18/11 | | |
| | SRTN - SERVICE RETURN (ATTACHED) | | |
| **Filing Date:** | 03-AUG-2011 | | |
| **Filing Party:** | BOCA ISLES PROPERTY OWNERS ASSOCIATION INC, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | SERVED 7/18/11 | | |
| | SRTN - SERVICE RETURN (ATTACHED) | | |
| **Filing Date:** | 03-AUG-2011 | | |
| **Filing Party:** | ELOWITZ, LESLIE | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | SVD 7-20-11 | | |
| | SRTN - SERVICE RETURN (ATTACHED) | | |
| **Filing Date:** | 03-AUG-2011 | | |
| **Filing Party:** | BOCA ISLES PROPERTY OWNERS ASSOCIATION INC, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | SVD 7-18-11 | | |
| | | | |

|  | SRTN - SERVICE RETURN (ATTACHED) |  |  |
|---|---|---|---|
| **Filing Date:** | 03-AUG-2011 | | |
| **Filing Party:** | ELOWITZ, DAVID | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | SERVED 7/20/11 | | |
|  | SRTN - SERVICE RETURN (ATTACHED) |  |  |
| **Filing Date:** | 03-AUG-2011 | | |
| **Filing Party:** | UNKNOWN PERSONS IN POSSESSION OF THE SUBJECT PROPERTY, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | NOT SERVED | | |
| 13 | NOAP - NOTICE OF APPEARANCE | | |
| **Filing Date:** | 16-AUG-2011 | | |
| **Filing Party:** | GOLANT , ESQ, MARGERY E | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | ON BEHALF OF DEFENDANTS DAVID ELOWITZ, LESLIE ELOWITZ | | |
| 14 | NOI - NOTICE OF INTENT | | |
| **Filing Date:** | 16-AUG-2011 | | |
| **Filing Party:** | ELOWITZ, DAVID | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | AND LESLIE ELOWITZ; TO REQUEST DISMISSAL IF PLAINTIFF DOES NOT COMPLY WITH F.S. 57.011 | | |
| 15 | NOT - NOTICE | | |
| **Filing Date:** | 18-AUG-2011 | | |
| **Filing Party:** | ELOWITZ, DAVID | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | AND LESLIE ELOWITZ, OF BORROWERS REQUEST FOR PLAINTIFF'S DISCLOSURE FOR MEDIATION | | |
| 16 | MOT - MOTION | | |
| **Filing Date:** | 18-AUG-2011 | | |
| **Filing Party:** | ELOWITZ, DAVID | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | AND LESLIE ELOWITZ; TO QUASH SERVICE | | |

| 17 | NOME - NOTICE OF MEDIATION | | |
|---|---|---|---|
| **Filing Date:** | 12-OCT-2011 | | |
| **Filing Party:** | | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | NOVEMBER 28, 2011AT 3PM | | |
| 18 | NOF - NOTICE OF FILING | | |
| **Filing Date:** | 25-OCT-2011 | | |
| **Filing Party:** | AURORA LOAN SERVICES LLC, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | NON-RESIDENT COST BOND | | |
| | RCPT - RECEIPT FOR PAYMENT | | |
| **Filing Date:** | 26-OCT-2011 | | |
| **Filing Party:** | KAHANE & ASSOCIATES P A, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | A Registry Deposit of $100.60 was receipted on receipt CAMB610363. The registry fees due on this deposit are $.00. | | |
| | RCPT - RECEIPT FOR PAYMENT | | |
| **Filing Date:** | 26-OCT-2011 | | |
| **Filing Party:** | KAHANE & ASSOCIATES P A, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | An Overpayment of $.60 was receipted on receipt CAMB610364. Associated with Registry Deposit receipted on receipt CAMB610363. | | |
| 19 | NOT - NOTICE | | |
| **Filing Date:** | 18-NOV-2011 | | |
| **Filing Party:** | AURORA LOAN SERVICES LLC, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | AMENDED FORM A | | |
| 20 | NOT - NOTICE | | |
| **Filing Date:** | 18-NOV-2011 | | |
| **Filing Party:** | AURORA LOAN SERVICES LLC, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | PLAINTIFF'S REPRESENTATIVE WILL APPEAR THROUGH THE USE OF COMMUNICATION EQUIPMENT AND DESIGNATION OF AUTHORITY TO SIGN SETTLEMENT AGREEMENT | | |
| 21 | MRPT - MEDIATION REPORT | | |

| Filing Date: | 05-DEC-2011 | | |
|---|---|---|---|
| Filing Party: | | | |
| Disposition Amount: | | | |
| Docket Text: | DFTS DID NOT ATTEND | | |
| 22 | NOT - NOTICE | | |
| Filing Date: | 05-DEC-2011 | | |
| Filing Party: | ELOWITZ, DAVID | | |
| Disposition Amount: | | | |
| Docket Text: | BORROWER NONPARTICIPATION WITH RMFM PROGRAM | | |
| 23 | NOT - NOTICE | | |
| Filing Date: | 12-DEC-2011 | | |
| Filing Party: | ELOWITZ, LESLIE | | |
| Disposition Amount: | | | |
| Docket Text: | AND DAVID ELOWITZ OF NON-COMPLIANCE AND POSTPONEMENT OF MEDIATION PURSUANT TO ADMINSTRATIVE ORDER 3.308 12-10 | | |
| 24 | ORSH - ORDER SETTING HEARING | | |
| Filing Date: | 09-APR-2012 | | |
| Filing Party: | | | |
| Disposition Amount: | | | |
| Docket Text: | (SPECIALLY) FOR 4/16/2012 AT 3:30 PM. J HOY. DTD 4/9/2012. | | |
| 28 | MOT - MOTION | | |
| Filing Date: | 09-APR-2012 | | |
| Filing Party: | ELOWITZ, DAVID | | |
| Disposition Amount: | | | |
| Docket Text: | AND LESLIE ELOWITZ, AMENDED TO QUASH SERVICE | | |
| 25 | AGOR - AGREED ORDER | | |
| Filing Date: | 11-APR-2012 | | |
| Filing Party: | | | |
| Disposition Amount: | | | |
| Docket Text: | ON DFTS' MOT TO QUASH SERVICE, GRANTED. HEARING SCHEDULED FOR 4/16/2012 AT 3:30 PM IS CANCELLED. D LEWIS. DTD 4/11/2012. | | |
| 26 | AGOR - AGREED ORDER | | |
| Filing Date: | 11-APR-2012 | | |

| Filing Party: | | | |
|---|---|---|---|
| Disposition Amount: | | | |
| Docket Text: | ON DFTS MOTION TO QUASH SERVICES - GRANTED DTD APRIL 10, 2012 J. HOY | | |
| 27 | AGOR - AGREED ORDER | | |
| Filing Date: | 12-APR-2012 | | |
| Filing Party: | | | |
| Disposition Amount: | | | |
| Docket Text: | ON DFTS' MOT TO QUASH SERVICE, GRANTED. J HOY. DTD 4/11/2012. | | |
| | RCPT - RECEIPT FOR PAYMENT | | |
| Filing Date: | 31-MAY-2012 | | |
| Filing Party: | AURORA LOAN SERVICES LLC, | | |
| Disposition Amount: | | | |
| Docket Text: | A Payment of -$20.00 was made on receipt CAMB681921. | | |
| 29 | ASIS - ALIAS SUMMONS ISSUED | | |
| Filing Date: | 31-MAY-2012 | | |
| Filing Party: | ELOWITZ, DAVID | | |
| Disposition Amount: | | | |
| Docket Text: | ASM-12-002198 | | |
| 30 | ASIS - ALIAS SUMMONS ISSUED | | |
| Filing Date: | 31-MAY-2012 | | |
| Filing Party: | ELOWITZ, LESLIE | | |
| Disposition Amount: | | | |
| Docket Text: | ASM-12-002199 | | |
| 31 | SVRT - SERVICE RETURNED (NUMBERED) | | |
| Filing Date: | 15-JUN-2012 | | |
| Filing Party: | ELOWITZ, LESLIE | | |
| Disposition Amount: | | | |
| Docket Text: | SERVED 6/5/12 | | |
| 32 | SVRT - SERVICE RETURNED (NUMBERED) | | |
| Filing Date: | 15-JUN-2012 | | |
| Filing Party: | ELOWITZ, DAVID | | |

| Disposition Amount: | | | |
|---|---|---|---|
| Docket Text: | SERVED 6/5/12 | | |
| 33 | MOT - MOTION | | |
| Filing Date: | 27-JUN-2012 | | |
| Filing Party: | ELOWITZ, DAVID | | |
| Disposition Amount: | | | |
| Docket Text: | AND LESLIE ELOWITZ; TO OUASH SERVICE OF PROCESS | | |
| 34 | NOUN - NOTICE OF UNAVAILABILITY | | |
| Filing Date: | 29-AUG-2012 | | |
| Filing Party: | GOLANT , ESQ, MARGERY E | | |
| Disposition Amount: | | | |
| Docket Text: | PERIODS COMMENCING OCTOBER 5,2012 - OCTOBER 19, 2012 | | |
| 35 | MOT - MOTION | | |
| Filing Date: | 20-SEP-2012 | | |
| Filing Party: | ELOWITZ, DAVID | | |
| Disposition Amount: | | | |
| Docket Text: | AND LESLIE El,OWITZ, TO QUASH SERVICE OF PROCESS | | |
| 36 | NOS - NOTICE OF SERVICE | | |
| Filing Date: | 20-SEP-2012 | | |
| Filing Party: | ELOWITZ, DAVID | | |
| Disposition Amount: | | | |
| Docket Text: | AND LESLIE ELOWITZ; OF DEFENDANTS' FIRST SET OF INTERROGATORIES AND FIRST REOUEST FOR PRODUCTION OF DOCUMENTS AND REOUEST FOR ADMISSIONS TO PLAINTIFF; ATTACHED | | |
| 37 | MOT - MOTION | | |
| Filing Date: | 24-SEP-2012 | | |
| Filing Party: | ELOWITZ, DAVID | | |
| Disposition Amount: | | | |
| Docket Text: | AND LESLIE ELOWITZ, TO QUASH SERVICE OF PROCESS, AMENDED | | |
| 38 | MEXT - MOTION FOR EXTENSION OF TIME | | |
| Filing Date: | 25-SEP-2012 | | |
| Filing Party: | AURORA LOAN SERVICES LLC, | | |

| Disposition Amount: | | | |
|---|---|---|---|
| Docket Text: | TO RESPOND TO DEFENDANTS' FIRST SET OF INTERROGATORIES, FIRST REQUEST FOR PRODUCTION, AND REQUEST FOR ADMISSIONS | | |
| 39 | NODP - NOTICE OF DROPPING PARTY | | |
| Filing Date: | 04-OCT-2012 | | |
| Filing Party: | AURORA LOAN SERVICES LLC, | | |
| Disposition Amount: | | | |
| Docket Text: | UNKNOWN PERSON IN POSSESSION | | |
| 40 | MDFT - MOTION FOR DEFAULT | | |
| Filing Date: | 04-OCT-2012 | | |
| Filing Party: | AURORA LOAN SERVICES LLC, | | |
| Disposition Amount: | | | |
| Docket Text: | AGAINST .............VIEW LIST. | | |
| 41 | NOF - NOTICE OF FILING | | |
| Filing Date: | 15-OCT-2012 | | |
| Filing Party: | ELOWITZ, DAVID | | |
| Disposition Amount: | | | |
| Docket Text: | AND LESLIE ELOWITZ DEFENDANTS' ORIGINAL AFFIDAVITS IN SUPPORT OF DEFENDANTS' AMENDED MOTION TO QUASH SERVICE OF PROCESS | | |
| 42 | DFT - DEFAULT | | |
| Filing Date: | 22-OCT-2012 | | |
| Filing Party: | MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC, | | |
| Disposition Amount: | | | |
| Docket Text: | AS NOMINEE FOR AEGIS FUNDING DBA AEGIS HOME EUITY; BOCA ISLES PROPERTY OWNERS ASSOCIATION; AND BOCA ISLES SOUTH PROPERTY OWNERS ASSOCAITION INC | | |
| | CHECK - CHECK PRINTED | | |
| Filing Date: | 05-FEB-2013 | | |
| Filing Party: | KAHANE & ASSOCIATES P A, | | |
| Disposition Amount: | | | |
| Docket Text: | A Disbursment of $.60 on Check Number 2972 to KAHANE & ASSOCIATES P A | | |
| 43 | MOT - MOTION | | |
| | | | |

| Filing Date: | 24-APR-2013 | | |
|---|---|---|---|
| Filing Party: | AURORA LOAN SERVICES LLC, | | |
| Disposition Amount: | | | |
| Docket Text: | FOR SUBSTITUTION OF PARTY PLTF | | |
| 44 | NCAN - NOTICE OF CANCELLATION | | |
| Filing Date: | 21-MAY-2013 | | |
| Filing Party: | | | |
| Disposition Amount: | | | |
| Docket Text: | NOTICE OF CANCELLATION OF HEARING ON 5/29.13 @8:45AM IN RE: PLTFS MOTION FOR SUBSTITUTION OF PARTY PLTF FILED BY STEPHEN WILSON ESQ | | |
| 45 | NCAN - NOTICE OF CANCELLATION | | |
| Filing Date: | 21-MAY-2013 | | |
| Filing Party: | | | |
| Disposition Amount: | | | |
| Docket Text: | NOTICE OF CANCELLATION OF HEARING SET 5/29/13 @8:45AM IN RE: PLTFS MOTION FOR SUBSTITUTION OF PARTY PLTF FILED BY STEPHEN WILSON ESQ | | |
| 46 | NOH - NOTICE OF HEARING | | |
| Filing Date: | 24-MAY-2013 | | |
| Filing Party: | AURORA LOAN SERVICES LLC, | | |
| Disposition Amount: | | | |
| Docket Text: | PLAINTIFF'S MOTION FOR SUBSTITUTION OF PARTY PLAINTIFF 5/29/13 8:45AM | | |
| 47 | NOH - NOTICE OF HEARING | | |
| Filing Date: | 28-MAY-2013 | | |
| Filing Party: | WILSON, STEPHEN | | |
| Disposition Amount: | | | |
| Docket Text: | PLAINTIFF'S MOTION FOR SUBSTITUTION OF PARTY PLAINTIFF JUNE 6,2013 AT 8:45 AM F/B ATTY STEPHEN WILSON | | |
| 48 | ORD - ORDER | | |
| Filing Date: | 07-JUN-2013 | | |
| Filing Party: | | | |
| Disposition Amount: | | | |
| Docket Text: | SUBSTITUTING PARTY PLAINTIFF: GRANTED: R ROSENBERG DTD 6/6/13 | | |

| 49 | SSUB - STIP SUBSTITUTION OF COUNSEL | | |
|---|---|---|---|
| **Filing Date:** | 14-MAR-2014 | | |
| **Filing Party:** | | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | STIPULATION FOR SUBSTITUTION OF COUNSEL | | |
| 50 | ORGM - ORDER REF TO GEN MSTR/MGST | | |
| **Filing Date:** | 24-MAR-2014 | | |
| **Filing Party:** | | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | AND ORDER SETTING CASE MANAGEMENT CONFERENCE SET FOR APRIL 14, 2014 AT 3:00 PM R OFTEDAL DTD 03/20/14 | | |
| 51 | ORDG - ORDER GRANTING | | |
| **Filing Date:** | 24-MAR-2014 | | |
| **Filing Party:** | | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | STIPULATION FOR SUBSTITUTION OF COUNSEL: HEREBY APPOINTED: E. BREGER DTD 3/21/14 | | |
| 52 | DORF - DOR FORECLOSURE FORM | | |
| **Filing Date:** | 15-APR-2014 | | |
| **Filing Party:** | AURORA LOAN SERVICES LLC, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | FORECLOSURE CASE STATUS FORM | | |
| 53 | RRGM - REPORT/RECOM. GENERAL MASTER | | |
| **Filing Date:** | 15-APR-2014 | | |
| **Filing Party:** | | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | ON CASE MANAGEMENT: PLT AND DFT APPEARED: CMC SHALL BE SET FOR 5/14/14 AT 9:00 AM: MOTION TO QUASH GRANTED FOR SPECIAL SET FOR 5/19/14 IS CANCELED: J. MAXION DTD 4/14/14 | | |
| 56 | RMAL - RETURNED MAIL | | |
| **Filing Date:** | 22-APR-2014 | | |
| **Filing Party:** | | | |
| **Disposition Amount:** | | | |

| Docket Text: | BOCA ISLES SOUTH PROPERTY OWNERS ASSOCIATION INC C/O BECKER PLIANKOFF | | |
|---|---|---|---|
| | RCPT - RECEIPT FOR PAYMENT | | |
| **Filing Date:** | 23-APR-2014 | | |
| **Filing Party:** | NATIONSTAR MORTGAGE LLC, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | A Payment of -$20.00 was made on receipt CAMB890704. | | |
| 54 | PSIS - PLURIES SUMMONS ISSUED | | |
| **Filing Date:** | 23-APR-2014 | | |
| **Filing Party:** | ELOWITZ, LESLIE | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | AS TO LESLIE ELOWITZ PSM-14-000251 | | |
| 55 | PSIS - PLURIES SUMMONS ISSUED | | |
| **Filing Date:** | 23-APR-2014 | | |
| **Filing Party:** | ELOWITZ, DAVID | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | AS TO DAVID ELOWITZ PSM-14-000252 | | |
| 57 | SVRT - SERVICE RETURNED (NUMBERED) | | |
| **Filing Date:** | 01-MAY-2014 | | |
| **Filing Party:** | ELOWITZ, DAVID | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | SERVED DAVID ELOWITZ ON 04/24/2014 (EFILED) | | |
| 58 | SVRT - SERVICE RETURNED (NUMBERED) | | |
| **Filing Date:** | 01-MAY-2014 | | |
| **Filing Party:** | ELOWITZ, LESLIE | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | SUBSTITUTE SERVED LESLIE ELOWITZ TO DAVID ELOWITZ ( FATHER) ON 04/24/2014 (EFILED) | | |
| 59 | ORD - ORDER | | |
| **Filing Date:** | 02-MAY-2014 | | |
| **Filing Party:** | | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | | | |

| | | | |
|---|---|---|---|
| | APPROVING, RATIFYING, CONFIRMING AND ADOPTING THE REPORT AND RECOMMENDATIONS OF THE MAGISTRATE E BREGER DTD 05/02/14 | | |
| 61 | AGOR - AGREED ORDER | | |
| **Filing Date:** | 02-MAY-2014 | | |
| **Filing Party:** | | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | ON PLAINTIFF'S CMC AND DFTS MOTION TO QUASH GRANTED ** SEE ORDER FOR DETAILS ** E BREGER DTD 05/02/14 | | |
| 60 | NOUN - NOTICE OF UNAVAILABILITY | | |
| **Filing Date:** | 06-MAY-2014 | | |
| **Filing Party:** | GOLANT , ESQ, MARGERY E | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | MAY 9, 2014-MAY 16, 2014 AND MAY 26, 2014- MAY 30,2014 | | |
| 62 | MOT - MOTION | | |
| **Filing Date:** | 13-MAY-2014 | | |
| **Filing Party:** | ELOWITZ, DAVID | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | DEFENDANTS' DAVID ELOWITZ AND LESLIE ELOWITZ'S MOTION TO OUASH SERVICE OF PROCESS & MOTION TO OUASH PLURIES SUMMONS | | |
| 63 | RRGM - REPORT/RECOM. GENERAL MASTER | | |
| **Filing Date:** | 14-MAY-2014 | | |
| **Filing Party:** | | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | ON CASE MANAGEMENT CONFERENCE: PLT APPEARED: CMC SHALL SET FOR 5/28/14 AT 3:00 PM: J. MAXION DTD 5/14/14 | | |
| 64 | RMAL - RETURNED MAIL | | |
| **Filing Date:** | 20-MAY-2014 | | |
| **Filing Party:** | | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | BOCA LSLES SOUTH PROPERTY OWNERS ASSOCIATION, INC C/O BECKER PLIAKOFF, RA | | |
| 65 | RNOH - RE-NOTICE OF HEARING | | |
| **Filing Date:** | 27-MAY-2014 | | |

| | | | |
|---|---|---|---|
| **Filing Party:** | NATIONSTAR MORTGAGE LLC, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | SPECIAL SET EVIDENTIARY: SET FOR 6/30/14 AT 11:00 AM | | |
| 66 | NOH - NOTICE OF HEARING | | |
| **Filing Date:** | 27-MAY-2014 | | |
| **Filing Party:** | NATIONSTAR MORTGAGE LLC, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | SET FOR 6/30/14 AT 11:00 AM | | |
| 67 | RNOH - RE-NOTICE OF HEARING | | |
| **Filing Date:** | 28-MAY-2014 | | |
| **Filing Party:** | AURORA LOAN SERVICES LLC, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | SET FOR 6/30/14 AT 11AM | | |
| 68 | ORSH - ORDER SETTING HEARING | | |
| **Filing Date:** | 28-MAY-2014 | | |
| **Filing Party:** | | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | SPECIALLY, EVIDENTIARY: SHALL BE SET FOR 6/30/14 AT 11:00 AM: R. COLTON DTD 5/28/14 | | |
| 69 | ORD - ORDER | | |
| **Filing Date:** | 29-MAY-2014 | | |
| **Filing Party:** | | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | SETTING CASE MANAGEMENT CONFERENCE ON JUL 28 2014 AT 1:30 PM R OFTEDAL DTD 05/28/14 | | |
| 70 | NOH - NOTICE OF HEARING | | |
| **Filing Date:** | 02-JUN-2014 | | |
| **Filing Party:** | BASSETT, RICHARD W | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | 7-28-14 @ 1:30 PM CASE MANAGEMENT CONFERENCE F/B RICHARD BASSETT | | |
| 71 | ORSH - ORDER SETTING HEARING | | |
| **Filing Date:** | 03-JUN-2014 | | |
| **Filing Party:** | | | |
| **Disposition Amount:** | | | |

| Docket Text: | SPECIALLY; ON DEFENDANT'S MOTION TO QUASH SERVICE: SHALL BE SET FOR 6/30/14 AT 11:00 AM: H. HARRISON DTD 6/2/14 | | |
|---|---|---|---|
| 72 | ORD - ORDER | | |
| Filing Date: | 03-JUN-2014 | | |
| Filing Party: | | | |
| Disposition Amount: | | | |
| Docket Text: | APPROVING, RATIFYING, CONFIRMING AND ADOPTING THE REPORT AND RECOMMENDATIONS OF THE MAGISTRATE: CMC 5/28/14 AT 3:00 PM: E. BREGER DTD 6/2/14 | | |
| 73 | NOH - NOTICE OF HEARING | | |
| Filing Date: | 04-JUN-2014 | | |
| Filing Party: | BASSETT, RICHARD W | | |
| Disposition Amount: | | | |
| Docket Text: | NOTICE OF HEARING ON 06/30/14 @ 11:00AM | | |
| 74 | NOH - NOTICE OF HEARING | | |
| Filing Date: | 25-JUN-2014 | | |
| Filing Party: | | | |
| Disposition Amount: | | | |
| Docket Text: | (CROSS) IN RE MOTION TO SUBSTITUTE PARTY PLT 7/28/2014 @ 1:30 | | |
| 75 | MOT - MOTION | | |
| Filing Date: | 25-JUN-2014 | | |
| Filing Party: | AURORA LOAN SERVICES LLC, | | |
| Disposition Amount: | | | |
| Docket Text: | F/B PLT AURORA LOAN SERVICES MOTION TO SUBSTITUTE PARTY PLT | | |
| 76 | SVRT - SERVICE RETURNED (NUMBERED) | | |
| Filing Date: | 27-JUN-2014 | | |
| Filing Party: | ELOWITZ, LESLIE | | |
| Disposition Amount: | | | |
| Docket Text: | SERVED LESLIE ELOWTIZ ON 4/24/14 | | |
| 77 | EXLT - EXHIBIT LIST | | |
| Filing Date: | 01-JUL-2014 | | |
| Filing Party: | | | |

| Disposition Amount: | | | |
|---|---|---|---|
| **Docket Text:** | EXHIBITS RECEIVED IN NJ TRIAL TAKEN TO EVIDENCE | | |
| 78 | ORD - ORDER | | |
| **Filing Date:** | 01-JUL-2014 | | |
| **Filing Party:** | | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | ON DEFENDANT'S DAVID ELOWITZ AND LESLIE ELOWITZ MOTION TO QUASH SERVICE OF PROCESS & MOTION TO QUASH PLURIES SUMMONS DENIED DFT SHALL FILE RESPONSE WITHIN 20 DAYS E BREGER DTD 06/30/14 | | |
| 79 | MOT - MOTION | | |
| **Filing Date:** | 10-JUL-2014 | | |
| **Filing Party:** | ELOWITZ, DAVID | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | MOTION FOR DISQUALIFICATION OF SENIOR JUDGE ELI BREGER FILED BY DFTS ELOWITZ UP 7-11-14 | | |
| 80 | MOT - MOTION | | |
| **Filing Date:** | 11-JUL-2014 | | |
| **Filing Party:** | ELOWITZ, DAVID | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | FOR DISQUALIFICATION OF SENIOR JUDGE ELI BREGER F/B DFTS | | |
| 81 | MOT - MOTION | | |
| **Filing Date:** | 11-JUL-2014 | | |
| **Filing Party:** | ELOWITZ, DAVID | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | AMENDED MOTION FOR DISQUALIFICATION OF SENIOR JUDGE ELI BREGER F/B DFT UP 07/11/14 | | |
| 82 | ORD - ORDER | | |
| **Filing Date:** | 15-JUL-2014 | | |
| **Filing Party:** | | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | ON MOTION FOR DISQUALIFICATION OF SENIOR JUDGE ELI BREGER AND AMENDED MOTION FOR DISQUALIFICATION OF SENIOR JUDGE ELI BREGER ARE GRANTED E BREGER DTD 07/14/14 | | |
| 83 | NOF - NOTICE OF FILING | | |

| Filing Date: | 23-JUL-2014 | | |
|---|---|---|---|
| Filing Party: | AURORA LOAN SERVICES LLC, | | |
| Disposition Amount: | | | |
| Docket Text: | AFFIDAVIT OF MILITARY SERVICE "ATTACHED" F/B PLT EFILED | | |
| 84 | NOF - NOTICE OF FILING | | |
| Filing Date: | 23-JUL-2014 | | |
| Filing Party: | NATIONSTAR MORTGAGE LLC, | | |
| Disposition Amount: | | | |
| Docket Text: | FILED BY PLT- NOTICE OF FILING AFFIDAVIT OF MILITARY SERVICE FOR DFTS DAVID ELOWITZ AND LESLIE ELOWITZ | | |
| 85 | MEXT - MOTION FOR EXTENSION OF TIME | | |
| Filing Date: | 23-JUL-2014 | | |
| Filing Party: | ELOWITZ, DAVID | | |
| Disposition Amount: | | | |
| Docket Text: | TO RESPOND TO PLAINTIFF'S COMPLAINT FILED BY DFTS | | |
| 86 | MDFT - MOTION FOR DEFAULT | | |
| Filing Date: | 25-JUL-2014 | | |
| Filing Party: | AURORA LOAN SERVICES LLC, | | |
| Disposition Amount: | | | |
| Docket Text: | MOTION FOR JUDICIAL DEFAULT AGAINST DFTS DAVID AND LESLIE ELOWITZ, EFILED BY PLT | | |
| 87 | MOT - MOTION | | |
| Filing Date: | 28-JUL-2014 | | |
| Filing Party: | ELOWITZ, DAVID | | |
| Disposition Amount: | | | |
| Docket Text: | DEFENDANTS DAVID ELOWITZ AND LESLIE ELOWITZ'S OPPOSITION TO PLAINTIFF'S MOTION TO SUBSTITUTE PARTY PLAINTIFF | | |
| 88 | NCAN - NOTICE OF CANCELLATION | | |
| Filing Date: | 28-JUL-2014 | | |
| Filing Party: | WERBER ESQ, BENJAMIN K | | |
| Disposition Amount: | | | |
| Docket Text: | 1 :30 P.M. ON JULY 28, 2014 | | |
| 89 | NOA - NOTICE OF APPEAL | | |

| | | Book 26947 - Page 1371 | |
|---|---|---|---|
| **Filing Date:** | 29-JUL-2014 | | |
| **Filing Party:** | | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | *none.* | | |
| | 801FF - CAFF/NOA/ | | |
| **Filing Date:** | 30-JUL-2014 | | |
| **Filing Party:** | GOLANT , ESQ, MARGERY E | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | *none.* | | |
| | RCPT - RECEIPT FOR PAYMENT | | |
| **Filing Date:** | 30-JUL-2014 | | |
| **Filing Party:** | GOLANT , ESQ, MARGERY E | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | A Payment of -$100.00 was made on receipt CAMB920187. | | |
| 90 | ARAF - AUTO RCPT OF APPELLATE FILING | | |
| **Filing Date:** | 30-JUL-2014 | | |
| **Filing Party:** | | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | NOA | | |
| 91 | ACKC - ACKNOWLEDGMENT OF NEW CASE | | |
| **Filing Date:** | 30-JUL-2014 | | |
| **Filing Party:** | | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | 14-2805 NON-FINAL | | |
| 92 | TCPY - TRUE COPY | | |
| **Filing Date:** | 30-JUL-2014 | | |
| **Filing Party:** | | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | ORDER 4TH DCA NOA FILED WITHOUT FILING FEE OR DET OF INDIGENT STATUS 10 DAYS | | |
| 93 | TCPY - TRUE COPY | | |
| | | | |

| Filing Date: | 30-JUL-2014 | | |
|---|---|---|---|
| Filing Party: | | | |
| Disposition Amount: | | | |
| Docket Text: | ORDER 4TH DCA COURT DETERMINES THAT APPEAL SEEKS REVIEW OF NON FINAL ORDER | | |
| 94 | MOT - MOTION | | |
| Filing Date: | 30-JUL-2014 | | |
| Filing Party: | ELOWITZ, DAVID | | |
| Disposition Amount: | | | |
| Docket Text: | MOTION FOR RECONSIDERATION AND MOTION TO VACATE JUNE 30TH , 2014 ORDERS OF SENIOR JUDGE ELI BREGER F/B DFTS | | |
| 95 | RESP - RESPONSE TO: | | |
| Filing Date: | 31-JUL-2014 | | |
| Filing Party: | AURORA LOAN SERVICES LLC, | | |
| Disposition Amount: | | | |
| Docket Text: | PLAINTIFF'S RESPONSE TO DEFENDANT'S FIRST REQUESTS FOR ADMISSIONS FILED BY PLT | | |
| 96 | ORD - ORDER | | |
| Filing Date: | 05-AUG-2014 | | |
| Filing Party: | | | |
| Disposition Amount: | | | |
| Docket Text: | SETTING CASE MANAGEMENT CONFERENCE ON SEP 12 2014 AT 1:30 PM R OFTEDAL DTD 08/05/14 | | |
| 97 | NOH - NOTICE OF HEARING | | |
| Filing Date: | 11-AUG-2014 | | |
| Filing Party: | HORNACK, JOHN C | | |
| Disposition Amount: | | | |
| Docket Text: | PLAINTIFF'S MOTION FOR JUDICIAL DEFAULT AGAINST DAVID ELOWITZ AND LESLIE ELOWITZ 8/21/14 8:45 AM F/B JOHN HORNACK | | |
| 99 | MOT - MOTION | | |
| Filing Date: | 20-AUG-2014 | | |
| Filing Party: | ELOWITZ, DAVID | | |
| Disposition Amount: | | | |
| Docket Text: | MOTION FOR STAY PENDING APPELLATE REVIEW F/B DFTS | | |

| 98 | OBJ - OBJECTION | | |
|---|---|---|---|
| **Filing Date:** | 21-AUG-2014 | | |
| **Filing Party:** | ELOWITZ, DAVID | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | F/B DEFENDANTS DAVID ELOWITZ AND LESLIE ELOWITZ OPPOSITION TO AND MOTION TO STRIKE PLAINTIFF'S MOTION FOR JUDICIAL DEFAULT | | |
| 100 | TCPY - TRUE COPY | | |
| **Filing Date:** | 22-AUG-2014 | | |
| **Filing Party:** | | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | ORDER 4TH DCA APPELLANT'S UNOPPOSED MOTION FOR EXT OF TIME IS GRANTED 45 DAYS | | |
| 101 | NCAN - NOTICE OF CANCELLATION | | |
| **Filing Date:** | 25-AUG-2014 | | |
| **Filing Party:** | HORNACK, JOHN C | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | 8/21/14 8:45 AM F/B ATTY | | |
| 102 | AORD - AMENDED ORDER | | |
| **Filing Date:** | 04-SEP-2014 | | |
| **Filing Party:** | | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | SETTING CASE MANAGEMENT CONFERENCE: SHALL BE SET FOR 9/12/14 AT 1:30 PM: R. COLTON DTD 9/3/14 | | |
| 103 | MOT - MOTION | | |
| **Filing Date:** | 09-SEP-2014 | | |
| **Filing Party:** | AURORA LOAN SERVICES LLC, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | TO SUBSTITUTE PARTY PLAINTIFF FILED BY PLT | | |
| 104 | NOH - NOTICE OF HEARING | | |
| **Filing Date:** | 09-SEP-2014 | | |
| **Filing Party:** | AURORA LOAN SERVICES LLC, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | (CROSS) 9-12-14 AT 1:30PM PLT MOTION TO SUBSTITUTE PARTY FILED BY PLT | | |
| 108 | RMAL - RETURNED MAIL | | |

| Filing Date: | 09-SEP-2014 | | |
|---|---|---|---|
| Filing Party: | | | |
| Disposition Amount: | | | |
| Docket Text: | BOCA ISLES SOUTH PROPERTY OWNERS ASSOCIATION, INC C/O BECKER PLIAKOFF, AS RA OF ONE BOCA PLACE | | |
| 107 | NOH - NOTICE OF HEARING | | |
| Filing Date: | 10-SEP-2014 | | |
| Filing Party: | WERBER ESQ, BENJAMIN K | | |
| Disposition Amount: | | | |
| Docket Text: | PLAINTIFF'S MOTION FOR JUDICIAL DEFAULT AGAINST DAVID ELOWITZ AND LESLIE ELOWITZ 09/12/14 AT 1:30PM FB BENJAMIN WERBER | | |
| 105 | NOH - NOTICE OF HEARING | | |
| Filing Date: | 11-SEP-2014 | | |
| Filing Party: | GOLANT , ESQ, MARGERY E | | |
| Disposition Amount: | | | |
| Docket Text: | ON DATE: SEPTEMBER 12 , 2014 TIME: 1:30 P.M - MOTION FOR STAY PENDING APPELLATE REVIEW F/B DFT'S ATTY | | |
| 109 | NCAN - NOTICE OF CANCELLATION | | |
| Filing Date: | 11-SEP-2014 | | |
| Filing Party: | HORNACK, JOHN C | | |
| Disposition Amount: | | | |
| Docket Text: | F/B PLT NOTICE OF CANCELLATION OF HEARING 9/12/2014 @ 1:30 PLT'S MOTION FOR COURT DEFAULT | | |
| 106 | NOH - NOTICE OF HEARING | | |
| Filing Date: | 12-SEP-2014 | | |
| Filing Party: | GOLANT , ESQ, MARGERY E | | |
| Disposition Amount: | | | |
| Docket Text: | AMENDED NOTICE OF HEARING ON SEP 12 2014 AT 1:30 PM - MOTION FOR STAY PENDING APPELLATE REVIEW; MOTION TO STRIKE PLAINTIFF'S MOTION FOR JUDICIAL DEFAULT F/B DFT'S ATTY | | |
| 110 | RPRS - REPLY/RESPONSE | | |
| Filing Date: | 12-SEP-2014 | | |
| Filing Party: | AURORA LOAN SERVICES LLC, | | |
| Disposition Amount: | | | |
| Docket Text: | | | |

| | PLAINTIFF'S REPLY TO DEFENDANTS' OBJECTION/OPPOSITION TO PLAINTIFF'S MOTION TO SUBSTITUTE PARTY PLAINTIFF, EFILED BY PLT | | |
|---|---|---|---|
| 111 | NCAN - NOTICE OF CANCELLATION | | |
| **Filing Date:** | 12-SEP-2014 | | |
| **Filing Party:** | AURORA LOAN SERVICES LLC, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | F/B PLT NOTICE OF CANCELLATION OF HEARING ON PLT'S MOTION FOR COURT DEFAULT @ 1:30 9/12/2014 | | |
| 112 | ORD - ORDER | | |
| **Filing Date:** | 15-SEP-2014 | | |
| **Filing Party:** | | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | ON CASE MANAGEMENT CONFERENCE: DFT AND PLT HAVE CROSS MOTIONS TO BE HEARD: COUNSEL SHALL SPECIAL SET BOTH MOTIONS TO BE HEARD: P BIEBEL DTD 9/12/14 | | |
| 113 | NRCB - NON RESIDENT COST BOND | | |
| **Filing Date:** | 06-OCT-2014 | | |
| **Filing Party:** | AURORA LOAN SERVICES LLC, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | F/B PLTF | | |
| | RCPT - RECEIPT FOR PAYMENT | | |
| **Filing Date:** | 07-OCT-2014 | | |
| **Filing Party:** | SHAPIRO FISHMAN & GACHE LLP, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | A Registry Deposit of $100.00 was receipted on receipt CAMB939371. The registry fees due on this deposit are $.00. | | |
| 114 | NOH - NOTICE OF HEARING | | |
| **Filing Date:** | 17-OCT-2014 | | |
| **Filing Party:** | AURORA LOAN SERVICES LLC, | | |
| **Disposition Amount:** | | | |
| **Docket Text:** | 12-8-14 AT 3:30PM PLT MOTION TO SUBSTITUTE PARY PLAINTIFF FILED BY PLT | | |
| 115 | ORD - ORDER | | |
| **Filing Date:** | 20-OCT-2014 | | |
| **Filing Party:** | | | |

| Disposition Amount: | |  |  |
|---|---|---|---|
| Docket Text: | SPECIAL SETTING HEARING ON DEC 8 2014 AT 3:30 PM CTRM 6K H HARRISON DTD 10/16/14 | | |
| 116 | NOUN - NOTICE OF UNAVAILABILITY |  |  |
| Filing Date: | 13-NOV-2014 | | |
| Filing Party: | GOLANT , ESQ, MARGERY E | | |
| Disposition Amount: | | | |
| Docket Text: | 11/24/14 THROUGH 11/28/14 AND 12/22/14 THROUGH 1/2/15 F/B ATTY GOLANT | | |
| 117 | NOH - NOTICE OF HEARING |  |  |
| Filing Date: | 02-DEC-2014 | | |
| Filing Party: | AURORA LOAN SERVICES LLC, | | |
| Disposition Amount: | | | |
| Docket Text: | 12/08/2014 8:45 AM RM 4A F/B PLT | | |
| 118 | ORD - ORDER |  |  |
| Filing Date: | 09-DEC-2014 | | |
| Filing Party: | | | |
| Disposition Amount: | | | |
| Docket Text: | SUBSTITUTING PARTY PLAINTIFF DEUTSCHE BANK TRUST COMPANY IS SUBSTITUTED AS PLT H HARRISON DTD 12/08/14 | | |
| 119 | ORD - ORDER |  |  |
| Filing Date: | 09-DEC-2014 | | |
| Filing Party: | | | |
| Disposition Amount: | | | |
| Docket Text: | ON DEFENDANT'S MOTION TO STAY: DENIED: H. HARRISON DTD 12/8/14 | | |
| 120 | MOT - MOTION |  |  |
| Filing Date: | 17-DEC-2014 | | |
| Filing Party: | ELOWITZ, DAVID | | |
| Disposition Amount: | | | |
| Docket Text: | MOTION FOR DISQUALIFICATION OF SENIOR JUDGE HOWARD HARRISON F/B/DEFENDANTS, DAVID ELOWITZ AND LESLIE ELOWITZ UP 12/19/14 | | |
| 121 | RMAL - RETURNED MAIL |  |  |
| Filing Date: | 19-DEC-2014 | | |

| Filing Party: | | | |
|---|---|---|---|
| Disposition Amount: | | | |
| Docket Text: | BOCA ISLES SOUTH PROPERTY OWNERS ASSOCIATION INC C/O BECKER PLIAKOFF AS REGISTERED AGEN OF ONE | | |
| 122 | RMAL - RETURNED MAIL | | |
| Filing Date: | 19-DEC-2014 | | |
| Filing Party: | | | |
| Disposition Amount: | | | |
| Docket Text: | UNKNOWN ADDRESSEE | | |
| 123 | ORD - ORDER | | |
| Filing Date: | 22-DEC-2014 | | |
| Filing Party: | | | |
| Disposition Amount: | | | |
| Docket Text: | ON MOTION FOR DISOUALIFICATION OF SENIOR JUDGE HOWARD HARRISON: DENIED: H HARRISON DTD 12/19/14 | | |
| 124 | TCPY - TRUE COPY | | |
| Filing Date: | 06-JAN-2015 | | |
| Filing Party: | | | |
| Disposition Amount: | | | |
| Docket Text: | ORDER 4TH DCA SUBSTITUTION OF PARTIES IS GRANTED | | |
| 125 | MOT - MOTION | | |
| Filing Date: | 23-JAN-2015 | | |
| Filing Party: | DEUTSCHE BANK TRUST COMPANY AMERICAS, | | |
| Disposition Amount: | | | |
| Docket Text: | F/B PLT DEUTSCHE BANK MOTION TO AMEND COMPLAINT | | |
| 126 | NOH - NOTICE OF HEARING | | |
| Filing Date: | 18-FEB-2015 | | |
| Filing Party: | | | |
| Disposition Amount: | | | |
| Docket Text: | F/B-ATTY MACIAS OBO PLT 3-10-15 8:45AM 4A | | |
| 127 | OBJ - OBJECTION | | |
| Filing Date: | 10-MAR-2015 | | |
| Filing Party: | GOLANT , ESQ, MARGERY E | | |
| Disposition Amount: | | | |
| Docket Text: | | | |

| | DEFENDANTS DAVID ELOWITZ AND LESLIE ELOWITZ'S OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO AMEND AND MOTION TO STRIKE PLAINTIFF'S MOTION FOR LEAVE TO AMEND F/B DFTS ATTY | | |
|---|---|---|---|
| 128 | OBJ - OBJECTION | | |
| Filing Date: | 10-MAR-2015 | | |
| Filing Party: | GOLANT , ESQ, MARGERY E | | |
| Disposition Amount: | | | |
| Docket Text: | DEFENDANTS DAVID ELOWITZ AND LESLIE ELOWITZ'S OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO AMEND AND MOTION TO STRIKE PLAINTIFF'S MOTION FOR LEAVE TO AMEND F/B DFTS ATTY | | |
| 129 | ORD - ORDER | | |
| Filing Date: | 11-MAR-2015 | | |
| Filing Party: | | | |
| Disposition Amount: | | | |
| Docket Text: | ON COURT'S SUA SPONTE MOTION FOR STAY PENDING APPEAL: **SEE ORDER FOR DETAILS ** W. SLAUGHTER DTD 3/10/15 | | |
| 130 | TCPY - TRUE COPY | | |
| Filing Date: | 23-MAR-2015 | | |
| Filing Party: | | | |
| Disposition Amount: | | | |
| Docket Text: | ORDER 4TH DCA APPELLANT'S MOTION FOR STAY IS DENIED | | |
| 131 | ORD - ORDER | | |
| Filing Date: | 07-APR-2015 | | |
| Filing Party: | | | |
| Disposition Amount: | | | |
| Docket Text: | SETTING CASE MANAGEMENT CONFERENCE: SHALL BE SET FOR 4/29/15 AT 9:00 AM IN 4A: W. SLAUGHTER DTD 4/7/15 | | |
| 132 | RMAL - RETURNED MAIL | | |
| Filing Date: | 13-APR-2015 | | |
| Filing Party: | | | |
| Disposition Amount: | | | |
| Docket Text: | BOCA ISLES PROPERTY OWNERS ASSOCIATION INC | | |
| 133 | NOT - NOTICE | | |
| Filing Date: | 14-APR-2015 | | |

| Filing Party: | DEUTSCHE BANK TRUST COMPANY AMERICAS, | | |
|---|---|---|---|
| Disposition Amount: | | | |
| Docket Text: | OF SERVICE OF ORDER SETTING CASE MANAGEMENT CONFERENCE F/B PLT | | |
| 134 | ORD - ORDER | | |
| Filing Date: | 29-APR-2015 | | |
| Filing Party: | | | |
| Disposition Amount: | | | |
| Docket Text: | TO AMEND COMPLAINT GRANTED ** SEE ORDER FOR DETAILS ** H HARRISON DTD 04/29/15 | | |
| 135 | NOF - NOTICE OF FILING | | |
| Filing Date: | 19-MAY-2015 | | |
| Filing Party: | DEUTSCHE BANK TRUST COMPANY AMERICAS, | | |
| Disposition Amount: | | | |
| Docket Text: | CERTIFICATION OF POSSESSION OF ORIGINAl NOTE FILED BY PLT | | |
| 136 | CMP - COMPLAINT | | |
| Filing Date: | 19-MAY-2015 | | |
| Filing Party: | DEUTSCHE BANK TRUST COMPANY AMERICAS, | | |
| Disposition Amount: | | | |
| Docket Text: | VERIFIED AMENDED MORTGAGE FORECLOSURE COMPLAINT FILED BY PLT | | |
| 137 | MOT - MOTION | | |
| Filing Date: | 26-MAY-2015 | | |
| Filing Party: | GOLANT , ESQ, MARGERY E | | |
| Disposition Amount: | | | |
| Docket Text: | DEFENDANTS' MOTION FOR A MORE DEFINITE STATEMENT & MOTION TO DISMISS AMENDED COMPLAINT F/B DFT'S ATTY | | |
| 138 | NORE - NOTICE OF REASSIGNMENT | | |
| Filing Date: | 28-MAY-2015 | | |
| Filing Party: | | | |
| Disposition Amount: | | | |
| Docket Text: | TO DIVISION AE JUDGE J TICKTIN PER AO 3.315 COPY EMAILED TO PLTFS COUNSEL | | |
| 139 | NOS - NOTICE OF SERVICE | | |
| Filing Date: | 02-JUN-2015 | | |

| Filing Party: | DEUTSCHE BANK TRUST COMPANY AMERICAS, | | |
|---|---|---|---|
| Disposition Amount: | | | |
| Docket Text: | REASSIGNMENT PER ADMIN. ORDER 3.315 FILED BY PLT | | |
| 140 | MAND - MANDATE | | |
| Filing Date: | 10-JUL-2015 | | |
| Filing Party: | | | |
| Disposition Amount: | | | |
| Docket Text: | AFFIRMED | | |
| 141 | NOUN - NOTICE OF UNAVAILABILITY | | |
| Filing Date: | 10-AUG-2015 | | |
| Filing Party: | DEUTSCHE BANK TRUST COMPANY AMERICAS, | | |
| Disposition Amount: | | | |
| Docket Text: | SEPTEMBER 3,2015 TO SEPTEMBER 9 2015 FILED BY DEUTSCHE BANK TRUST | | |
| 142 | NOH - NOTICE OF HEARING | | |
| Filing Date: | 10-AUG-2015 | | |
| Filing Party: | DEUTSCHE BANK TRUST COMPANY AMERICAS, | | |
| Disposition Amount: | | | |
| Docket Text: | COURTROOM 9A 8:45 AM 8/17/15 F/B PLT | | |
| 144 | ORD - ORDER | | |
| Filing Date: | 17-AUG-2015 | | |
| Filing Party: | | | |
| Disposition Amount: | | | |
| Docket Text: | MOTION TO DISMISS AMENDED COMPLAINT IS VOLUNTARILY WITHDRAWN , DEFTS SHALL FILE ANSWR BY 9/8/15 DD 8/17/15 J GILLEN | | |
| 143 | NOT - NOTICE | | |
| Filing Date: | 18-AUG-2015 | | |
| Filing Party: | DEUTSCHE BANK TRUST COMPANY AMERICAS, | | |
| Disposition Amount: | | | |
| Docket Text: | F/B PLT NOTICE OF SERVICE OF ORDER ON DFTS MOTION FOR A MORE DEFINITE STATEMENT & MOTION TO DISMISS AMENDED COMPLAINT | | |
| 145 | NOS - NOTICE OF SERVICE | | |
| Filing Date: | 21-AUG-2015 | | |
| Filing Party: | ELOWITZ, DAVID | | |

| Disposition Amount: | | | |
|---|---|---|---|
| Docket Text: | OF DISCOVERY REQUESTS UPON PLAINTIFF F/B DFTS ELOWITZ | | |
| 146 | RQAD - REQUEST FOR ADMISSIONS | | |
| Filing Date: | 21-AUG-2015 | | |
| Filing Party: | ELOWITZ, DAVID | | |
| Disposition Amount: | | | |
| Docket Text: | F/B DFTS ELOWITZ | | |
| 147 | REQP - REQUEST TO PRODUCE | | |
| Filing Date: | 21-AUG-2015 | | |
| Filing Party: | ELOWITZ, DAVID | | |
| Disposition Amount: | | | |
| Docket Text: | FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF F/B DFTS ELOWITZ | | |
| 148 | NOT - NOTICE | | |
| Filing Date: | 24-AUG-2015 | | |
| Filing Party: | DEUTSCHE BANK TRUST COMPANY AMERICAS, | | |
| Disposition Amount: | | | |
| Docket Text: | PLAINTIFF'S NOTICE OF SERVING FIRST SET OF INTERROGATORIES TO DEFENDANT, DAVID ELOWITZ F/B PLTF | | |
| 149 | NOT - NOTICE | | |
| Filing Date: | 24-AUG-2015 | | |
| Filing Party: | DEUTSCHE BANK TRUST COMPANY AMERICAS, | | |
| Disposition Amount: | | | |
| Docket Text: | PLAINTIFF'S NOTICE OF SERVING FIRST SET OF INTERROGATORIES TO DEFENDANT, LESLIE ELOWITZ F/B PLTF | | |
| 150 | RQAD - REQUEST FOR ADMISSIONS | | |
| Filing Date: | 24-AUG-2015 | | |
| Filing Party: | DEUTSCHE BANK TRUST COMPANY AMERICAS, | | |
| Disposition Amount: | | | |
| Docket Text: | REQUEST FOR ADMISSIONS TO DEFENDANT, LESLIE ELOWITZ F/B PLTF | | |
| 151 | REQ - REQUEST | | |
| Filing Date: | 24-AUG-2015 | | |

| Filing Party: | DEUTSCHE BANK TRUST COMPANY AMERICAS, | | |
|---|---|---|---|
| Disposition Amount: | | | |
| Docket Text: | FOR PRODUCTION OF DOCUMENTS TO DFT LESLIE ELOWITZ F/B PLTF | | |
| 152 | REQ - REQUEST | | |
| Filing Date: | 24-AUG-2015 | | |
| Filing Party: | DEUTSCHE BANK TRUST COMPANY AMERICAS, | | |
| Disposition Amount: | | | |
| Docket Text: | PLAINTIFF, AURORA LOAN SERVICES, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANT, DAVID ELOWITZ F/B PLTF | | |
| 153 | RQAD - REQUEST FOR ADMISSIONS | | |
| Filing Date: | 24-AUG-2015 | | |
| Filing Party: | DEUTSCHE BANK TRUST COMPANY AMERICAS, | | |
| Disposition Amount: | | | |
| Docket Text: | REQUEST FOR ADMISSIONS TO DEFENDANT, DAVID ELOWITZ F/B PLTF | | |
| 154 | ANAD - ANSWER & AFFIRMATIVE DEFENSES | | |
| Filing Date: | 08-SEP-2015 | | |
| Filing Party: | ELOWITZ, DAVID | | |
| Disposition Amount: | | | |
| Docket Text: | TO AMENDED COMPLAINT F/B DFTS ELOWITZ | | |
| 155 | NOAP - NOTICE OF APPEARANCE | | |
| Filing Date: | 11-SEP-2015 | | |
| Filing Party: | LEVINE , ESQ., ERIC M | | |
| Disposition Amount: | | | |
| Docket Text: | AS ADDITIONAL COUNSEL FOR PLAINTIFF FILED BY ATTY LEVINE | | |
| 156 | RERQ - RESPONSE TO REQ FOR ADMISSION | | |
| Filing Date: | 16-SEP-2015 | | |
| Filing Party: | DEUTSCHE BANK TRUST COMPANY AMERICAS, | | |
| Disposition Amount: | | | |
| Docket Text: | FILED BY PLTF | | |
| 157 | RRTP - RESPONSE TO REQ TO PRODUCE | | |

| Filing Date: | 16-SEP-2015 | | |
|---|---|---|---|
| Filing Party: | DEUTSCHE BANK TRUST COMPANY AMERICAS, | | |
| Disposition Amount: | | | |
| Docket Text: | FILED BY PLTF | | |
| 158 | RERQ - RESPONSE TO REQ FOR ADMISSION | | |
| Filing Date: | 22-SEP-2015 | | |
| Filing Party: | ELOWITZ, DAVID | | |
| Disposition Amount: | | | |
| Docket Text: | F/B DFT | | |
| 159 | MEXT - MOTION FOR EXTENSION OF TIME | | |
| Filing Date: | 28-SEP-2015 | | |
| Filing Party: | DEUTSCHE BANK TRUST COMPANY AMERICAS, | | |
| Disposition Amount: | | | |
| Docket Text: | PLAINTIFF DEUTSCHE BANK'S MOTION FOR EXTENSION OF TIME TO RESPOND TO COUNTERCLAIMS; F/B PLTF | | |
| 160 | MEXT - MOTION FOR EXTENSION OF TIME | | |
| Filing Date: | 28-SEP-2015 | | |
| Filing Party: | ELOWITZ, DAVID | | |
| Disposition Amount: | | | |
| Docket Text: | ELOWITZ' MOTION FOR ENLARGEMENT OF TIME TO FILE A REPLY TO THE AFFIRMATIVE DEFENSES OF CITIMORTGAGE, INC; F/B DFT | | |

▶ Search Home  ▶ New Search  ▶ Report Selection  | ▶ Case Description  |
▶ Related Cases  ▶ Event Schedule  ▶ Case Parties  | ▶ Docket Entries  |

(c) Copyright 1998 Affiliated Computer Systems, Inc. ACS and the ACS logo are registered trademarks. CourtConnect is a trademark of ACS. This contains trade secrets and is subject to a confidentiality agreement. The unauthorized possession, use, reproduction, distribution, display, or disclosure of this material or the information contained herein is prohibited. All rights reserved. User Accepts/Agrees to Disclaimer. Not for official use.

# EXHIBIT C

Filing # 31763951 E-Filed 09/08/2015 02:29:22 AM



IN THE CIRCUIT COURT OF THE 15th
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

Deutsche Bank Trust Company Americas as
Trustee for Residential Accredit Loans, Inc.
Pass Through Certificates 2005-Q01,

      Plaintiff,

vs.

      CASE NO: 50 2011 CA010307 MB
      DIVISION: AW

DAVID ELOWITZ, et. al.,

      Defendants.

_____/

## ANSWER and AFFIRMATIVE DEFENSES TO AMENDED COMPLAINT

    COME NOW, the Defendants, DAVID ELOWITZ and LESLIE ELOWITZ, and answer
the Plaintiff's Amended Complaint as follows:

1.  Admitted in part.  While this purports to be an action to foreclose a mortgage on real
property located in Palm Beach County, Florida, since Plaintiff lacked standing at the
inception of this action, this court lacks subject matter jurisdiction. Due to the lack of
standing in this Plaintiff, this court lacks subject matter jurisdiction to afford any relief
requested by Plaintiff.  Strict proof is demanded.

2.  Admitted that Defendants executed and delivered loan documents in favor of US Mortage
of Florida to US Mortgage.  Denied that Defendants "delivered" any documents Plaintiff.
It is specifically denied that Plaintiff has any rights in connection with any note or
mortgage ever executed by Defendants. Defendants further deny the authenticity and the
authority of any and all purported endorsements to the subject note, if any, as same are
solely manufactured to perpetrate a fraud upon this court. Defendants deny the
authenticity of the mortgage attached to the Plaintiff's Amended Complaint, as same is
illegible and not a true copy of an original, but rather a copy of a document procured off
of the internet. Accordingly this averment is denied.  Strict proof demanded.



3. Defendants are without knowledge as to whether Plaintiff is currently in possession of the original note. However, Defendants deny that Plaintiff has any right to enforce the note, whether in possession or not. Defendants cannot discern if said documents are copies copy of any documents executed by them. Strict proof is demanded. It is Denied that the Plaintiff or its predecessor, now or at any time, either owned or "held" said note, as on the contrary, while the original Plaintiff, at the inception of litigation claimed that it was the "holder" of the subject note, that contention was false and fraudulent. Plaintiff does is not the owner and holder of the obligation on which it purports to sue. See *Sosa v. U.S. Bank Nat. Ass'n* , 153 So.3d 950 (Fla. 4th DCA 2014) "For a plaintiff to prove that it had standing to bring a foreclosure action, the plaintiff must prove that it had standing when the complaint was filed."

4. Admitted that Defendants own the property which is the subject of this action. Denied that Plaintiff has any rights in connection therewith. Strict proof demanded.

5. Expressly denied that Defendants are in default to Plaintiff or that they had any obligation to make payments to Plaintiff, and deny that they are in default on any obligation to Plaintiff. that Plaintiff has any authority to declare any amount of payment due, or in default. Denied that Plaintiff has any right to "declare" any amounts to be due or payable to it from Defendants. Strict proof demanded.

6. Denied. Neither Plaintiff nor the real party in interest nor any third party acting on their behalf provided Defendants with the requisite notice of the alleged default and opportunity to cure as required by paragraph 22 of the mortgage documents. Furthermore, denied that Plaintiff has complied with the notice of assignment provisions contained within Section 559.715 et seq., Florida Statutes, which is a mandatory condition precedent, in the event that any assignment or transfer of the ownership of the note and mortgage ever did occur. Furthermore, Plaintiff's pleadings evidence that this requirement was not satisfied, as Plaintiff's pleadings reflect a claim by a party which is not the originator, and include an exhibit containing numerous endorsements, yet provides no notice of assignment from that party to any subsequent party, and no notice

of assignment from any party to the Plaintiff.  Furthermore, denied on the grounds that
Plaintiff failed to provide Defendants/ Counter Plaintiffs with proper Notice of forced
placed insurance as required by paragraphs 3, 9 and 15 of the security instrument, for
sums which Plaintiff/Counter-defendant now attempts to foreclose despite failing to
fulfill its obligations under the security instrument. Denied that any notices provided
complied with any notice requirements under the FDCPA. It is specifically denied that
the mandatory conditions precedent which would be required in connection with a
lawsuit on the purported debt were ever fulfilled or complied with.  Neither Plaintiff nor
the real party in interest nor any third party acting on their behalf provided Defendants
with the requisite notice of the alleged default and opportunity to cure as required by
paragraph 22 of the mortgage documents. Furthermore, Denied that Plaintiff has
complied with the notice of assignment provisions contained within Section 559.715 et
seq., Florida Statutes is a mandatory condition precedent, which, in the event that any
assignment or transfer of the ownership of the note and mortgage ever did occur.  Strict
proof demanded.

7.  Denied.  Defendants have no liability to Plaintiff, personal or otherwise for the reasons
stated herein and no amounts due, or owing to the Plaintiff by the Defendants.  Strict
proof demanded.

8.  Without knowledge concerning the relationship between Plaintiff and counsel, and
therefore denied, however Plaintiff is not entitled to recover attorneys' fees or any other
sum from Defendants.  Admitted only to the extent that Plaintiff has obviously retained
counsel.  Defendants are without knowledge concerning the relationship between
Plaintiff and its counsel, and expressly deny that Plaintiff is entitled to relief in this
action. Defendants also deny that Plaintiff is entitled to recover any attorney's fees
expended in this action.   Strict proof demanded.

9.  Denied.  Specifically denied that Plaintiff has any rights in the property at all, or that
there are any rights in the property subordinate to any purported claim by the Plaintiff.
Strict proof demanded.

10. Specifically denied that Plaintiff has any rights in the property at all, or that there are any rights in the property subordinate to any purported claim by the Plaintiff. Strict proof demanded.

11. Specifically denied that Plaintiff has any rights in the property at all, or that there are any rights in the property subordinate to any purported claim by the Plaintiff. Strict proof demanded.

12. Specifically denied that Plaintiff has any rights in the property at all, or that there are any rights in the property subordinate to any purported claim by the Plaintiff. Strict proof demanded.

WHEREFORE, Defendants demand that the claims of the Plaintiff be denied and that judgment be entered in favor of the Defendants, including their reasonable attorneys' fees.

## AFFIRMATIVE DEFENSES
### First Affirmative Defense - Lack of Standing

1.      Plaintiff does not have standing to pursue the claims alleged in its Amended Complaint.

2.      At the inception of litigation, the original Plaintiff, claiming to be a servicer, contended that its standing was based upon a claim that it was the "holder" of the subject note, and not the real party in interest. However, the exhibits to the original complaint, just as the exhibits to the Amended Complaint, clearly demonstrate that there was never an original note in the possession of the original Plaintiff specially endorsed to it or endorsed in blank. Accordingly, the original Plaintiff lacked standing to have commenced this action. ("If the plaintiff is not the payee of the original note, the plaintiff must also prove that the original note contains an indorsement in favor of the plaintiff (special indorsement) or an indorsement in blank". (*Russell v. Aurora*, 163 So. 3d 639 (2nd DCA, 2015). The original Plaintiff improperly procured the substitution of the current plaintiff,  "A substituted plaintiff acquires only the standing of the original plaintiff." (*Id.* At 642).

3.      The exhibits to Plaintiff's original and amended Complaint demonstrate at most a loan in favor of a stranger to this action, and not the Plaintiff herein or its predecessor. Plaintiff has not provided any evidence or any purported ultimate facts supporting any credible transfer of any purported debt to the Plaintiff herein. Plaintiff has no rights in connection with any note or mortgage ever executed by Defendants and neither it nor the original Plaintiff had standing to have brought this lawsuit.

4.      Accordingly, since Plaintiff did not have possession of the subject original note when this action was commenced and since Plaintiff is not the owner of the subject obligation, Plaintiff clearly lacks any standing to have brought the instant action.

WHEREFORE, Defendants demand that the claims of the plaintiff be denied and that judgment be entered in favor of the Defendants, including their reasonable attorneys' fees.

### Second Affirmative Defense - Failure of Conditions Precedent

5.      The mortgage sued under and attached to Plaintiff's Complaint contains mandatory conditions precedent that were never satisfied by Plaintiff or by the true owner of the subject note and mortgage. Accordingly, even if it did not lack standing, the claims of Plaintiff as well as those of the true owner of the subject note and mortgage are barred. Specifically, the said mortgage requires the Plaintiff to provide Defendants with notice of the alleged default and a reasonable opportunity to cure.

6.      Paragraph 22 of the subject mortgage states:

22. Acceleration; Remedies. Lender shall give notice to the Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured

by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. …

7.      Neither Plaintiff nor the real party in interest nor any third party acting on their behalf provided Defendants with the requisite notice of the alleged default and opportunity to cure as required by the mortgage documents.

8.      Compliance with the notice of assignment provisions contained within Section 559.715 et seq., Florida Statutes (2007) is a mandatory condition precedent, which, in the event that any assignment or transfer of the ownership of the note and mortgage ever did occur, was not satisfied.

9.      Failure to provide Defendants/ Counter Plaintiffs with proper Notice of forced placed insurance as required by paragraphs 3, 9 and 15 of the security instrument, for sums which

10.     Plaintiff now attempts to foreclose despite failing to fulfill its obligations under the security instrument.   However, the failure of conditions precedent bars any action thereunder, even if the Plaintiff did have standing.

WHEREFORE, Defendants demand that the claims of the plaintiff be denied and that judgment be entered in favor of the Defendants, including their reasonable attorneys' fees.

### Third Affirmative Defense - Unclean Hands

11.     Aurora Loan Services (hereinafter Original Servicer), is a mortgage servicer. A stranger to this action originated the subject mortgage loan.

12.     The originator of the loan conveyed all of its right title and interest in the subject loan to a third party soon after origination.

13.     Original Servicer owned no interest in the subject loan when it commenced this action, nor did it have possession of the original note, containing a special endorsement in its favor or endorsed in blank.  It is evident from the exhibits attached to the original complaint that no such endorsement existed, and Defendants contend that, at inception of this action, Original Servicer did not have possession of the original note at all.

14.     Subsequently, servicing of the subject loan was transferred to Nationstar Mortgage (hereinafter "Servicer")

15.     As described in the accompanying Third Party Claim,  Servicer has unlawfully conspired with American Security Insurance Company (hereinafter Insurer) to illegally coerce Defendants into paying excessive and statutorily prohibited separate charges for "force-placed" or "lender-placed" insurance, as well as to violate other sections of the Florida Insurance Code.  In doing so, Servicer was acting as the subcontractor of the real owner of the subject loan.

16.     Therefore, pursuant to the doctrine of *respondeat superior*, the owner of the loan is liable for Servicer's actions.  Accordingly, any equitable claims by the actual owner of the loan, no matter who it may be, are barred by the unclean hands doctrine.

17.     The current servicer, the agent of the real party in interest, whoever it really is, has conspired with Insuror to inflate Defendants' debt by failing to properly apply payments, and by charging excessive and unauthorized fees, which it unlawfully added to the balance of Defendants' mortgage loan.   Although the owner of the mortgage loan is not a party to this action, it is liable for its agents' misconduct under the doctrine of *respondeat superior*. Accordingly, if it later joins or is substituted in this action, its equitable claims will also be barred by the unclean hands doctrine.

18.     The original complaint clearly demonstrates that the original Plaintiff lacked standing to foreclose, and untruthfully claimed to be the "holder" of the note in order to mislead the court into believing that it did have standing.

19.    Original Plaintiff, therefore, comes to this court, not only with "unclean hands" of having pled falsely or in reckless disregard of the truth, but by falsely claiming to hold the subject note, which was untrue.

20.    Current Plaintiff has attempted to continue to pursue this action, although it knew that Original Plaintiff did not have the standing to have commenced this action.

21.    Both Original and Current Plaintiff conspired with currently unknown parties to violate Defendants' rights as set forth in the attached mortgage and note, and the common and statutory law of the State of Florida by virtue of dishonest and inaccurate loan accounting and adding predatory insurance fees to the loan.

22.    Original and Current Plaintiff and Original and Current Servicer have utilized unfair and deceptive collection practices to bring and to perpetuate this action, and to attempt to improperly assert a default against Defendants.

23.    Defendants raise the Defense of Unclean Hands in that Original and Current Plaintiff Original and Current Servicer have utilized unfair and deceptive collection practices to bring and to perpetuate this action, and to attempt to improperly assert a default against Defendants.

24.    It is a well-established principle of law that a statutory violation is, in itself, conduct rising to the level of Unclean Hands.

25.    As set forth in the Third Party Claim following hereinafter, Servicer provided "insurance information" as that term is defined in section 626.9551(d) to Insurer. This is a violation of section 626.9551(d).

WHEREFORE, Defendants demand that the claims of the plaintiff be denied and that judgment be entered in favor of the Defendants, including their reasonable attorneys' fees.

## SIXTH AFFIRMATIVE DEFENSE – FAILURE TO MITIGATE DAMAGES

26.    Plaintiff refused to engage in any efforts to mitigate the damages it untruthfully claims to have suffered.

27.    Plaintiff utterly failed to make reasonable efforts to mitigate damages.

28.    Furthermore, the real party in interest fails to employ reasonable procedures to facilitate loan workouts on reasonable terms or proper loan servicing standards.

29.    Because reasonable procedures are not employed aimed at mitigating any loss which is asserted in this lawsuit, even if it did have standing, or even if the real party in interest were joined herein, it should not be allowed to pursue this action or to obtain a judgment against Defendants.

WHEREFORE, Defendants demand that the claims of the Plaintiff be denied and that judgment be entered in favor of the Defendants, including his reasonable attorneys' fees.

## SEVENTH AFFIRMATIVE DEFENSE – ILLEGAL CHARGES ADDED TO BALANCE

30.    Original Servicer and Current Servicer, purporting to be the loan's owner although that was clearly untrue, have charged and attempted to collect excessive, unnecessary and unreasonable fees from Defendants for purported attorneys' fees, legal fees, litigation attorney fees, foreclosure costs, late charges, property inspection fees, "property valuation" charges, and other charges and advances, and predatory fees and charges that would be excessive, unwarranted, improper, not authorized by, or in conformity with, the terms of the subject loan documents, even if the Plaintiff had a legitimate connection to the subject loan and to the

Defendants,  and even more improper and unlawful since it does not.  Furthermore, none of the documents attached to the complaint demonstrate any foundation in law for any of the charges or fees in question.

31.    Servicer, and before it, Original Servicer, the subcontractors of the real party in interest, wrongfully added and continues to unilaterally add these illegal charges to the balance which it falsely claims is due and owing under the subject loan documents.

32.    Defendants are entitled to recover reasonable attorneys' fees for the defense of this wrongful mortgage foreclosure action pursuant to the reciprocal fee shifting provisions of Section 57.105(7), Florida Statues (2007).

WHEREFORE, Defendants demand judgment in their favor, together with an award of attorneys' fees and litigation costs.

## EIGHTH AFFIRMATIVE DEFENSE – VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

33.    Due to the failure to provide notice of assignment as required by law, Defendants were misled into believing that the originator remained the real party in interest.

34.    Thereafter, Original and Current Servicer, acting as subcontractors for the secret assignee, added and charged and/or collected payments from Defendants for improper, unlawful and unjustified force-placed insurance as hereinbefore and thereinafter described, attorney fees, legal fees, litigation attorney fees, foreclosure costs, late charges, property inspection fees, "property valuation" charges, and other charges and advances, and predatory fees and charges that are not authorized by or in conformity with the terms of the subject loan documents.

35.     Original Plaintiff wrongfully claims to have accelerated the debt and then wrongfully commenced this action. Current Plaintiff continued and ratified the misrepresentations of Original Plaintiff, and Servicer wrongfully added and continue to unilaterally add these illegal charges to the balance Plaintiff claims is due and owing under the subject loan documents, knowing that it is lacking in standing to have done so.

36.     Plaintiff, as well as Original Plaintiff, have perpetuated this wrongful action by falsely representing to the court and to Defendants that each was the proper Plaintiff when that is untrue and Plaintiff and Original Plaintiff knew it to be untrue.

37.     The deceptive and unfair acts and practices of Plaintiffs, its predecessor, agents and representatives are violative of the Florida Deceptive and Unfair Trade Practices Act, Chapter 501 F.S., Part II, were and are to the injury and prejudice of Defendants and have resulted in loss and damages to him.

WHEREFORE, Defendant demand judgment in his favor, together with an award of attorneys' fees and litigation costs.

## ELEVENTH AFFIRMATIVE DEFENSE

10.     Defendants assert that the signatures on the note and mortgage are not authentic or authorized. Notice is hereby given pursuant to Florida Statutes 673.3081 that the Defendants challenge the authenticity and authority of each signature on the Note and any and all documents introduced by the Plaintiff which purport to be documents transferring any interest therein.

*(the remainder of this page intentionally left blank)*

## COUNTERCLAIM / THIRD PARTY CLAIM

## I. PARTIES JURISDICTION, AND VENUE

1.    This is an action for damages in excess of $15,000.

2.    Third Party Plaintiffs/ Counter-Plaintiffs David and Leslie Elowitz (hereinafter "Borrowers") are natural persons, over the age of 21, and otherwise *sui juris.*

3.    Third Party Nationstar Mortgage, LLC (hereinafter and previously referred to as "Servicer") is a foreign, for-profit corporation engaged in the business of servicing residential mortgage loans in Florida, including Palm Beach County Florida.

4.    Counter-Defendant is a mortgage securitization which purports to be the Plaintiff and real party in interest with respect to the subject mortgage loan.

5.    The acts that give rise to this lawsuit took place in Palm Beach County, Florida.

## II. GENERAL ALLEGATIONS

6.    As a mortgage servicer, Servicer is responsible for handling all customer service functions on behalf of the ultimate owner of Borrowers' mortgage loan.

7.    Servicer untruthfully holds itself out to be the creditor to whom Borrowers' mortgage loan is owed, and appeared to Borrowers to be his mortgage lender.

8.    In fact, Servicer simply contracts with the beneficial owners of those mortgage loans within its servicing portfolio.

9.    Counter-Defendant is aware of, and enables all of the unlawful conduct of Servicer in connection with the subject mortgage loan, and accordingly is a conspirator with respect to all improper and unlawful actions addressed herein. In addition, Counter-Defendant is liable for all of Servicer's actions under the doctrine of *respondeat superior.*

10.    In exchange for servicing those mortgage loans in its servicing portfolio, Servicer receives a fee, or fees, paid by the actual owners of the mortgage debt.

11.     While it may deduct its servicing fees from the payments that it collects from the mortgagor's whose mortgage loans it servicers, Servicer is required to remit the majority of the payments that it collects to its principal.

12.     If any particular mortgage loan in its servicing portfolio goes into a default status, Servicer's fees and other income related to that loan are not reduced.

13.     As part of its duties as a mortgage servicer, Servicer is required to monitor the mortgage loans within its servicing portfolio to make sure that the borrowers maintain property insurance that adequately protects the mortgagee's interest in the collateral property.

14.     If a borrower fails to maintain insurance coverage, Servicer is authorized to procure insurance coverage for that borrower's property.  This type of insurance coverage is referred to as "force-placed" or "lender-placed" insurance.

15.     The cost of the force-placed insurance is then passed on to the affected borrower. If the borrower does not pay, Servicer pursues collection action against the borrower. Ultimately, this includes filing a lawsuit seeking a foreclosure of the mortgage and a deficiency judgment against the affected borrower.

16.     Servicer makes all the necessary decisions relating to the purchase of force-placed insurance, including the amount of coverage and the acceptable premium.

17.     Servicer purports to advance the payment for premiums for the force-placed insurance policies that it purchases.  However, in fact, no premium is advanced.

18.     Assurant, Inc. (hereinafter "Insurer") has entered into various "reinsurance" agreements with Servicer, as well as many other mortgage servicers. Pursuant to these agreements, the profits generated from the sale of force-placed insurance policies are divided between Insurer and the mortgage servicers, including Servicer herein.

19.     The reinsurance agreement between Servicer and Insurer constitutes a joint venture.

20. The cost of the insurance sold pursuant to the American Security/Nationstar "reinsurance" joint venture is dramatically higher than the cost of similar coverage available through the traditional market.

21. The coverage provided by the American Security/Nationstar joint venture is more limited than the less expensive coverage available through the traditional market.

**The Force-Placed Insurance Industry**

22. Lenders and servicers force place insurance when a borrower fails to obtain or maintain proper hazard, flood, or wind insurance coverage on property that secures a loan. Under the typical mortgage agreement, if the insurance policy lapses or provides insufficient coverage, the lender has the right to "force place" a new policy on the property and then charge the premiums to the borrower.

23. However, mortgage lenders and servicers have set up questionable and often illegal practices related to force-placed insurance. The lenders and servicers have entered into exclusive and collusive relationships with certain force-placed insurance providers, here Assurant and its affiliate ASIC, that result in exceptional profits to both the lenders and the force-placed insurers.

24. The arrangements comprise an extremely lucrative profit-making scheme that reaps hundreds of millions of dollars annually for its participants. There are just two insurance companies that control nearly the entire market for forced-placed policies in the country—Assurant and QBE. Assurant works through its subsidiaries, including ASIC. Assurant works through its subsidiaries Voyager Indemnity Insurance Company and American Security Insurance Company.

25. These companies and their affiliates enter into exclusive relationships with the major mortgage lenders and servicers to provide the policies. To maintain their exclusive relationships with these lenders, the insurers pay them unearned "kickbacks," in the form of

direct payments (disguised as qualified expense reimbursements) or in the form of a percentage of the force-placed policy premiums, charged to the borrower, offer them subsidized or discounted administrative services, or enter into lucrative captive reinsurance deals with them.

26.     The money to finance the force-placed insurance schemes comes from unsuspecting borrowers who are charged inflated amounts for the force-placed insurance by lenders or servicers. In many instances, borrowers are required to pay for backdated insurance coverage to cover periods during which no claims were made, or coverage that exceeds the legal requirements, and are charged additional improper fees.

27.     Counter-Defendant and Third Party Defendant's force-placed insurance scheme takes advantage of the broad discretion afforded the lenders and/or servicers in standard form mortgage agreements. The agreements typically require the borrower to carry flood and hazard insurance sufficient to cover the lender's interest in the property against fire and other perils. If a homeowner's "voluntary" policy lapses, the mortgage agreement allows the lender to "force place" a new policy on the property at the borrower's expense.

28.     Although force-placed insurance is designed to protect the lender's interest in the property that secures the loan and thus should not exceed that interest, s e r v i c e r s often purchase coverage from their exclusive insurers in excess of that required to cover their own risk. And, as a matter of practice, the major servicers collude with the two major force-placed insurers to manipulate the force-placed insurance market, which leads to artificially inflated premiums and charges to consumers that result in premiums up to ten times greater than those available to the consumer in the open market. Lenders, servicers, and force-placed insurers reap these unconscionable profits entirely at the expense of the unsuspecting borrower.

29.     At a recent hearing on force-placed insurance held by the National Association of Insurance Commissioners ("NAIC"), Birny Birnbaum, the foremost expert on the force-placed insurance market, illustrated the staggering growth in profits that Defendants' schemes have reaped in recent years:[1]

---

[1] This graph and the ones that follow were taken from Mr. Birnbaum's presentation to the NAIC

## LPI Premiums Have Quadrupled Since 2004

| Year | Gross Written Premium ($ Millions) | Net Written Premium ($ Millions) |
|---|---|---|
| 2004 | $1,485 | $796 |
| 2005 | $1,832 | $919 |
| 2006 | $2,163 | $1,074 |
| 2007 | $3,058 | $1,647 |
| 2008 | $4,000 | $2,209 |
| 2009 | $5,181 | $3,049 |
| 2010 | $5,915 | $3,223 |
| 2011 | $5,692 | $3,450 |
| 2004-2011 | $29,326 | $16,368 |

2009-2011 GWP Understated, Reporting Errors by QBE

CEJ LPI Presentation to NAIC                    13                    August 9, 2012

30.    Co-conspirator Assurant, is one of the two major insurance companies that control virtually the entire market for force-placed insurance. As shown below, Assurant held 58.6% of the nationwide market share for force-placed insurance in 2011.    Together, Assurant and QBE/Balboa, the other major insurer with a significant market share, controlled 99.7% of the market in the same year, and held no less than 96.1% of the market between 2004 and 2011.  Large mortgage lenders and servicers sustain the insurers' monopoly by agreeing to purchase all force-placed insurance from the two insurers in exchange for kickbacks and other benefits.

---

on August 9, 2012. The presentation is available at:
http://www.naic.org/documents/committees_c_120809_public_shearing_lender_placed_insuranc
e_presentation_birnbaum.pdf.

## Assurant and QBE Are the Market for LPI:

## Countrywide Market Share

| Year | Assurant | QBE/Balboa | Assurant + QBE/Balboa |
|------|----------|------------|-----------------------|
| 2004 | 68.2% | 29.8% | 98.0% |
| 2005 | 69.7% | 26.4% | 96.1% |
| 2006 | 79.2% | 19.5% | 98.7% |
| 2007 | 74.0% | 25.4% | 99.4% |
| 2008 | 74.2% | 25.5% | 99.7% |
| 2009 | 57.2% | 42.4% | 99.7% |
| 2010 | 56.2% | 43.5% | 99.7% |
| 2011 | 58.6% | 41.1% | 99.7% |

CEJ LPI Presentation to NAIC                    18                                        August 9, 2012

31.      It is no surprise that Third Party-Defendant's and other servicers' and their insurance partners' practices have come under increased scrutiny in recent years by the government and regulators. For example[2]:

> • On March 21, 2013, the New York Department of Financial Services' ("NYDFS"), investigation into force-placed insurance practices "produced a major settlement with the country's largest 'force-placed' insurer, Assurant, Inc. . . . [The settlement] includes restitution for homeowners who were harmed, a $14 million penalty paid to the State of New York, and

---

[2]The Counter-Defendant's practices have also come under increased scrutiny by the courts. A class action is in the process of being certified against Nationstar and Assurant on many of the same practices described here. See Braynen v. Nationstar, No. 14-cv-20726 (S.D. Fla. 2014).

industry-leading reforms that will save homeowners, taxpayers, and investors millions of dollars going forward through lower rates."[3]   Further, under the Consent Order entered, Assurant and its subsidiaries (including ASIC and SGIC), are prohibited from paying commissions to any servicers or entity affiliated with a servicer on force-placed insurance policies obtained by the servicer. See Assurant & NYDFS Consent Order, Mar. 21, 2013, attached hereto as Exhibit B.

- At NYDFS hearings on May 17, 2012 related to the force-placed insurance market, the Superintendent of Financial Services, Benjamin Lawsky, stated that the Department's initial inquiry uncovered "serious concerns and red flags" which included: 1) exponentially higher premiums, 2) extraordinarily low loss ratios, 3) lack of competition in the market, and 4) tight relationships between the banks, their subsidiaries, and insurers. She went on to state:
  > In sum when you combine [the] close and intricate web of relationships between the banks and insurance companies on the one hand, with high premiums, low loss ratios, and lack of competition on the other hand, it raises serious questions . . . .
- After the August 2012 NAIC hearings, the state regulator from Louisiana, James Donelon, referred to the force-placed insurance market as a "monopoly" and stated that stricter regulations may be needed.[3]
- On December 18, 2013, Fannie Mae issued its Servicing Guide Announcement related to force-placed insurance that, among other things, prohibits servicers from including any commissions, bonuses, or other incentive compensation in the amounts charged to borrowers for force-placed insurance and further requires that the force-placed insurance carrier cannot be an affiliated entity of the servicer.[4]

32.    Florida has now become the epicenter for these force-placed insurance schemes. In his presentation to the NAIC, Mr. Birnbaum illustrated the astounding rise in force-placed insurance policies in Florida:

---

[3] See Z. Tracer & D. Beasley, *U.S. Regulators to Examine Forced-Place Insurance*. BLOOMBERG BUSINESSWEEK, Aug. 10, 2012, *available at*, http://www.bloomberg.com/news/2012-08-10/u-sregulators-to-examine-forced-place-insurance.html.
[4] See https://www.fanniemae.com/content/announcement/svc1327.pdf

## LPI Premium by State:  Florida Has Become Ground Zero

|      | 2004  | 2005  | 2006  | 2007  | 2008  | 2009  | 2010  | 2011  |
|------|-------|-------|-------|-------|-------|-------|-------|-------|
| FL   | 10.6% | 10.8% | 13.3% | 17.9% | 22.9% | 34.3% | 36.7% | 35.1% |
| CA   | 20.8% | 19.3% | 21.2% | 23.5% | 24.3% | 14.0% | 11.1% | 10.2% |
| TX   | 10.6% | 10.7% | 8.8%  | 8.7%  | 7.0%  | 5.6%  | 5.6%  | 6.1%  |
| NY   | 3.6%  | 3.6%  | 4.5%  | 4.4%  | 4.3%  | 4.7%  | 5.4%  | 5.6%  |
| IL   | 3.0%  | 3.3%  | 3.9%  | 3.7%  | 3.9%  | 4.4%  | 4.1%  | 4.6%  |
| NJ   | 2.9%  | 2.7%  | 2.9%  | 2.7%  | 2.7%  | 2.9%  | 3.4%  | 4.0%  |
| MI   | 4.2%  | 4.4%  | 4.4%  | 5.8%  | 3.6%  | 2.7%  | 2.2%  | 2.0%  |
| OH   | 3.6%  | 3.8%  | 3.5%  | 2.7%  | 2.4%  | 2.2%  | 2.3%  | 2.9%  |
| GA   | 3.4%  | 3.2%  | 3.2%  | 2.4%  | 2.3%  | 2.3%  | 2.3%  | 2.3%  |
| PA   | 2.6%  | 2.6%  | 2.7%  | 1.8%  | 1.8%  | 1.8%  | 1.7%  | 1.8%  |

CEJ LPI Presentation to NAIC                    15                         August 9, 2012

33.     Third-Party Defendant's self-dealing and collusion in the force-placed insurance market has caused substantial harm to Third-Party Plaintiffs/Counter-Plaintiffs, driving them into default and making it impossible for them to resolve the default.

34.     This Third Party Claim is brought directly against Nationstar

35.     Third-Party Defendant, conspired with its subsidiary, Harwood Service Company, LLC ("Harwood Service"), and Nationstar Mortgage Holdings Inc. (collectively the "Nationstar Counter-Defendants"), Assurant, Inc. ("Assurant"), American Security Insurance Company ("American Security" or "ASIC"), Voyager Indemnity Insurance Company ("VIIC"), and Standard Guaranty Insurance Company ("SGIC") committed violations of the FDUTPA and the common law of Florida.

36. Harwood is an affiliate of Nationstar. Harwood provides broker services only for Nationstar and its affiliates, and consequently is the captive insurance broker for Nationstar. Upon information and belief, Harwood performs no functions related to the procurement of force-placed insurance coverage for individual borrowers and yet collects a "commission" tied to a percentage of the cost of each force-placed insurance premium.

37. Nationstar is liable for the conduct of Harwood at issue in this Counterclaim.

38. Third-Party Defendant, either directly or in collaboration with Harwood began force-placing excessive insurance on Third-Party Plaintiffs/Counter-Plaintiffs' property, and applying the related charges to their mortgage loan account.

39. Third-Party Defendant and its co-conspirators overcharged Third-Party Plaintiffs/Counter-Plaintiffs for the coverage.

40. Superior coverage was available in the voluntary market for much less than the amounts charged to Third-Party Plaintiffs/Counter-Plaintiffs.

41. Even if the force-placement were authorized by the mortgage documents (and it was not), the charges assessed to Third-Party Plaintiffs/Counter-Plaintiffs were patently unreasonable.

42. Third-Party Defendant procured the multiple overpriced insurance policies force-placed insurance through Assurant Inc. or its subsidiaries. Pursuant to a complex web of agreements, Assurant funneled nearly 75% of the premium associated with this force-placed insurance back to Third-Party Defendant.

43. In addition, force-placed insurance providers enter into essentially riskless "captive reinsurance arrangements" with lenders and their affiliates to "reinsure" the property insurance force-placed on borrower. A recent American Banker article detailed this reinsurance problem with respect to JP Morgan Chase Bank:

JPMorgan and other mortgage servicers' reinsure the property insurance

they buy on behalf of mortgage borrowers who have stopped paying for their own coverage. In JPMorgan's case, 75% of the total force-placed premiums cycle back to the bank through a reinsurance affiliate. This has raised further questions about the force-placed market's arrangements. Over the last five years, Chase has received $660 million in reinsurance payments and commissions on force-placed policies, according to New York's DFS.

Of every hundred dollars in premiums that JPMorgan Chase borrowers pay to Assurant, the bank ends up keeping $58 in profit, DFS staff asserted. The agency suggested the bank's stake in force-placed insurance may encourage it to accept unjustifiably high prices by Assurant and to avoid filing claims on behalf of borrowers, since that would lower its reinsurer's returns. The DFS staff also questioned the lack of competition in the industry, noting that Assurant and QBE have undertaken acquisitions that give them long-term control of 90% of the market. Further limiting competition are the companies' tendency to file identical rates in many states, Lawsky and his staff argue.

44. Counter Defendant has exclusive arrangements with Assurant and its subsidiaries, American Security and Voyager, to monitor their mortgage portfolios and provide force-placed insurance. In addition to the subsidized mortgage services they receive from Assurant, the Nationstar Defendants are kicked back a percentage of the force-placed premium which is paid to Harwood, which in turn compensates Nationstar.

45. Third-Party Defendant applied the premiums for the wrongfully procured force-placed insurance to Third-Party Plaintiffs/Counter-Plaintiffs's mortgage loan account, and significantly increased the amount of money demanded for the monthly mortgage payments, distorting the amounts which it claimed were due, driving him into default, greatly impairing his ability to resolve the default imposed on him, and ultimately resulting in foreclosure proceedings. As of the date hereof this pleading, the foreclosure lawsuit is still pending.

46. In 2010, Congress passed the Dodd/Frank Wall Street Reform and Consumer Protection Act, which included substantial amendments to the Real Estate Settlement Procedures Act. The Consumer Financial Protection Bureau was charged with developing implementing regulations. Both the Dodd/Frank amendments to RESPA and the related amendments to Regulation X became effective on January 10th, 2014.

47. The Third-Party Defendant improperly treated the unlawful force-placed insurance charges as "escrow advances", and set about adding one twelfth of the total amount charged to Third-Party Plaintiffs/Counter-Plaintiffs's monthly payments, designed to recoup the force-placed insurance charges long before the scheduled maturity date for the loan.

48. The improper application of the disputed force-placed insurance charges caused the monthly payment that Third-Party Defendant demanded to increase materially.

49. Third-Party Plaintiffs/Counter-Plaintiffs attempted to continue to make payments, but the increasing and improper burdens which the inflated "escrow account" payments caused made it impossible for him to make the payments, forcing him into default.

## COUNT I – BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

50. Counter Plaintiff re-alleges and incorporates by reference his allegations in Paragraphs 1 through 47 above.

51. A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance. Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

52. Where an agreement affords one party the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

53. Third-Party Plaintiffs/Counter-Plaintiffs's mortgage contract allow the mortgage servicer to force place an insurance policy on the borrower's property in the event of a lapse in coverage, but do not define standards for selecting an insurer or procuring an insurance policy. The mortgage contracts afford the Third-Party Defendant discretion in force placing insurance coverage. They are permitted to unilaterally choose the company from which they purchase insurance and negotiate a price for the coverage they procure. The servicers have an obligation to exercise the discretion afforded them in good faith, and not capriciously or in bad faith.

Plaintiffs do not seek to vary the express terms of the mortgage contract, but only to insure that the Defendants exercise their discretion in good faith.

54. Servicers have an obligation to exercise the discretion afforded them in good faith, and not capriciously or in bad faith.

55. Third-Party Defendant has failed to exercises its discretion in good faith.

56. Third-Party Defendant on behalf of itself and/or its principal breached the implied covenant of good faith and fair dealing by, among other things:

a.     Violating an express term of the contract

b.     Manipulating the force-placed insurance market by selecting insurers, upon information and belief, that will artificially inflate premiums to upon information and belief include kickbacks to Third-Party Defendant and/or affiliates and issue excess insurance coverage not necessary to cover risk, and by failing to seek competitive bids on the open market and instead contracting to create "back room" deals whereby insurance coverage is routinely purchased from their affiliates without seeking a competitive price;

b.   Assessing duplicative, inflated and unnecessary insurance policy premiums against Third-Party Plaintiffs/Counter-Plaintiffs and misrepresenting the reason for the cost of the policies;

c.   Collecting a percentage or allowing its affiliates to collect a percentage of whatever premiums are charged to Third-Party Plaintiffs/Counter-Plaintiffs and not passing that percentage on to the borrower, thereby creating the incentive to seek the highest-priced premiums possible;

e.   Charging Third-Party Plaintiffs/Counter-Plaintiffs for commissions when the insurance is prearranged and no commission is due;

f.   Charging Third-Party Plaintiffs/Counter-Plaintiffs inflated premiums due to the captive reinsurance arrangement;

g.     Deliberately failing to notify Third-Party Plaintiffs/Counter-Plaintiffs that the forced-placed insurance allegedly purchased was from an entity affiliated, owned or controlled by Third-Party Defendant;

j.  Force placing insurance coverage in excess of what is required by law or Third-Party Plaintiffs/Counter-Plaintiffs 's mortgage; and

k.   Force placing insurance coverage in excess of that required to cover the lender's interest in the property, or the balance owed on the loan.

l.   Accepting amounts or commissions from Assurant based on the artificially- inflated force-placed insurance amounts charged to Third-Party Plaintiffs/Counter-Plaintiffs.

m.  Entering into force-place insurance quota-share captive reinsurance arrangements on new or renewal force-place insurance.

n.   Placing force-place insurance through an insurer affiliated with Third-Party Defendant.

57. As a direct, proximate and legal result of the aforementioned breaches of the covenants of good faith and fair dealing, Third-Party Plaintiffs/Counter-Plaintiffs has been damaged.

58. Third-Party Plaintiffs/Counter-Plaintiffs reserves their right to seek punitive damages against Third-Party Defendant, upon sufficient showing by the discovery and pleadings in this matter.

WHEREFORE, Third-Party Plaintiffs/Counter-Plaintiffs seeks a judicial declaration determining that the premiums charged and the terms of the force-placed insurance flood insurance policies violate the duties of good faith and fair dealing. Third-Party Plaintiffs also seek compensatory damages from Third-Party Defendant, resulting from Third-Party Defendant's breach of the duties of good faith and fair dealing in performance. Plaintiff further seeks all relief deemed appropriate by this Court, including attorneys' fees and costs, and demands a trial by jury thereon.

## COUNT II. – MULTIPLE VIOLATIONS OF SECTION 626.9551, FLORIDA STATUTES

59. In the case at bar, the American Security/Nationstar joint venture procured an insurance policy insuring Borrower's property for a premium that was approximately twice the amount available for similar coverage available through the traditional market.

60.     The policy sold by the American Security/Nationstar joint venture provided less coverage than other insurance policies that were available through the traditional market.

61.     The inflated premium for American Security/Nationstar insurance policy assessed to Borrower constitutes an indirect separate charge imposed on a borrower or mortgagor related to the handling of an insurance policy required in connection with a loan or other extension of credit.  This is expressly prohibited by section 626.9551(c), Florida Statutes.

62.     In order to further the objectives of the American Security/Nationstar joint venture, Servicer provided "insurance information" as that term is defined in section 626.9551(d) to Insurer.  In doing so, both violated section 626.9551(d).

63.     Servicer has purported to add the inflated cost of the American Security/Nationstar insurance to Borrowers's mortgage balance.  Servicer has also orchestrated the initiation of a foreclosure lawsuit, in part to collect the inflated and unlawful charges associated with the American Security/Nationstar insurance policy from Borrowers. Accordingly, the American Security/Nationstar joint venture has effectively made the purchase of his insurance policy a condition subsequent to Borrowers's mortgage loan in violation of section 626.9551(d)

64.     As a result of the above described actions by Servicer and Insurer, Borrowers has been damaged. Section 624.155(1)(a) 2 expressly authorizes any person who is damaged by a violation of section 626.9551.

65.     The above described actions of Servicer and Insurer constitute a civil conspiracy, accordingly each is liable for the unlawful conduct of the other.

66.     The above described actions are willful wanton and malicious, or in reckless disregard of Borrowers's and similar situated consumers' rights. Borrowers intends to seek leave

of Court to assert a claim for punitive damages at the appropriate time.

**DEMAND FOR TRIAL BY JURY ON THIRD PARTY CLAIMS**

67.     Borrowers demands trial by jury on all Third Party Claims.

**CLAIM FOR PREVAILING PARTY ATTORNEYS FEES FOR THIRD PARTY CLAIMS**

**68.**     Borrowers is entitled to an award of prevailing party attorneys fees pursuant to section 624.155(4), Florida Statutes.

**COUNTERCLAIM**
**COUNTERCLAIM -GENERAL ALLEGATIONS**

1.  All factual averments contained in the Third Party Claim set forth above are incorporated herein by reference as though set forth at length.

2.  This is an action for damages in excess of $15,000 and otherwise within the jurisdiction of this Court.

3.  This Court has personal jurisdiction over Servicer because Servicer voluntarily invoked this Court's jurisdiction by causing and/or maintaining the filing the original mortgage foreclosure action and because Servicer routinely engages in the business of servicing residential mortgage loans secured by real estate located in Palm Beach County, Florida.

4.  Further, the owner of the mortgage loan is liable for its agents' misconduct under the doctrine of *respondeat superior*.

5.  As set forth above, Servicer utilizes the services of Assurant, Inc. and its subsidiaries, including American Security Insurance Company (ASIC) and possibly other of its subsidiaries,

such as Voyager Indemnity Insurance Company and Standard Guaranty Insurance Company (hereinafter "Insuror"), an insurance company operating in the State of Florida for the purpose of routinely engaging in the business of tracking insurance coverage on mortgage loans located in Palm Beach County, Florida, brokering force-placed insurance transactions covering real estate located in Palm Beach County, Florida and is authorized by the Florida Department of Financial Services to act as an insurance broker in Florida.

6.   Servicer is engaged in the business of servicing residential mortgage loans that belong to third parties.

7.   Many of the loans within Servicer's mortgage portfolio have been securitized, meaning that the beneficial interest in the mortgage debts have been transferred to third party investors. Securitized mortgage loans are administered by a securitization trustee, and a mortgage servicer. The mortgage servicer preforms routine day-to-day management functions associated with mortgage loans, including collection of payments, collection activities associated with delinquent loans, and handling all customer service and Defendant contact.

8.   For all practical purposes, a mortgage servicer appears to the Defendants to be the mortgagee, and few defendants understand the difference between the mortgagee and loan servicer.

9.   As a mortgage servicer, Servicer is responsible for ensuring that the Defendants whose loans it manages maintain property insurance consistent with the requirements in the mortgage contracts.   If a Defendant fails to maintain appropriate insurance, Servicer is both authorized and required to obtain appropriate replacement insurance.

10. This is often referred to as both "force-placed insurance and "lender placed insurance." However, the term "lender placed insurance" is a misnomer. Force placed insurance is almost always placed by mortgage servicers who are not lenders, have no property interest in the collateral, no insurable interest in the collateral, and no financial interest in the processing of any claims made under those polices.

11. Insuror has entered into arrangements with a number of mortgage servicers, including Servicer whereby it assumes Servicer's responsibility for monitoring the loans within its servicing portfolio in order to ensure that the owners of the collateral properties maintain appropriate hazard insurance coverage. Under this arrangement, Insuror is given the exclusive right by Servicer to procure force-placed insurance when Insuror asserts that the Defendants' voluntary coverage has lapsed. As part of this arrangement, Insuror is given access to Servicer's computerized servicing systems containing extensive information about the Defendants, their properties, and the loans that Servicer services.

12. The services that Insuror performs for Servicer is not limited to services related to force-placed insurance. For example, Insuror also preforms "loss draft" services whereby Insuror will handle indemnity funds paid by an insurer when there is a covered loss to property within Servicer's portfolio, in order to make sure that the Defendants uses those funds for repairs to the damaged collateral. Insuror even performs these "loss draft" services when there is no force-placed insurance and the indemnity funds are paid by a Defendant's voluntary carrier.

13. The amount of money that Servicer pays Insuror for providing these outsourced insurance services for its mortgage servicing portfolio is less than the cost of providing these services.

The primary reason why Insuror provides these services is because Servicer allows Insuror the exclusive right to procure force-placed insurance from the carrier of Servicer's choice, from which Insuror makes a substantial profit.

14. Force-placed insurance is extremely lucrative for Insuror and its affiliated insurers. In fact, the insurance industry measures the profitability of an insurance program through "loss ratios." In the State of Florida for the past five years, Assurant's force-placed insurance program has produced loss ratios well under the industry average. Conversely, a normal loss ratio for a property insurer would ordinarily be well in excess of 60%. Thus, the force-placed insurance that Insuror purchased for Defendants' property generated many times the profit for the insurer that a standard policy would generate.

15. The profitability of this insurance product is underscored by the fact that Insuror received a commission that was more than 40% of the premium charged.

16. At all times material thereto, Insuror was acting as the agent of Servicer.

17. In order to induce Servicer to allow it to obtain its lucrative force-placed insurance business, Insuror agreed to provide its outsourced insurance services at a loss. This in turn allowed Servicer to reduce its overhead and increase its profits, particularly since the outsourced insurance servicers are part of the services that it is contractually obligated to perform on behalf of the mortgage investors who own the loans that it servicers. Those insurance related servicing functions are contemplated by the agreed upon Servicing fees.

18. Insuror and its affiliates have also offered monetary incentives to mortgage servicers in order to obtain the right to force-place insurance on their mortgage portfolios. These incentives

include, but are not limited to, paying large and unearned "commissions" to insurance agencies affiliated with the servicer, despite the fact that the servicer affiliated insurance agency did little or nothing to earn any payment.

19. Although Servicer, through the referenced outsource arrangement with Insuror, makes the purchasing decision for the force-placed insurance, it does not pay the premium because that cost is passed on to the Defendants, and to other borrowers within its portfolio. Similarly, Servicer does not have any interest in the insured collateral. Accordingly, Servicer has no economic incentive to make a reasonable decision when it selects a force-placed insurance provider.

20. Insuror and the other companies' force-placed insurance practices have been the focus of a significant amount of regulatory and class action litigation in recent years.

21. More particularly, the relationship between Servicer and Insuror and their predatory and unlawful practices relating to Defendants are the subject of a class action lawsuit styled *Howard Braynen et al v Nationstar Mortgage, LLC*, et al, U.S. District Court, Southern District of Florida, No 14-cv-20726

22. Defendants own property located in Palm Beach County, Florida. This property is subject to a first mortgage lien that was created as a result of a transaction that was consummated in 2005. At origination, the mortgage loan was owned by the originator, however ownership was later transferred to a non-party.

23. As a mortgage servicer, Servicer is engaged in handling accounting, customer service, collection, and virtually all other services related to managing the residential mortgage loans in

its portfolio. For all practical purposes, Servicer and other mortgage servicers generally appear to the Defendants whose loan they service as the mortgagee or "lender." However, Servicer simply services Defendants' mortgage loans, and many other mortgage loans, as a contracted agent acting on behalf its clients

24. Because an unidentified third party, as opposed to Servicer, is the mortgagee and "Note Holder" as that term is defined in the subject note and mortgage, these contracts are between Defendants and the real party in interest. Thus, Servicer is not a party to the mortgage contracts or security interest at issue in this case. Accordingly, Servicer cannot enforce the contractual jury trial waiver provisions. Furthermore, Servicer would not realize a financial loss if the subject mortgage loan were ultimately foreclosed and the collateral property sold for less than the balance of the loan. Instead, that loss would fall upon the investor that employs Servicer as the loan servicer.

25. Servicer's predecessor commenced an action against Defendants, misrepresenting that it was the proper party to have commenced the action.

26. As of the date of this pleading, Defendants are still in possession of the property that secured by the mortgage loan that gives rise to this lawsuit.

## COUNT I – TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP

27. Third-Party Plaintiffs/Counter-Plaintiffs re-allege and incorporate by reference the allegations in Paragraphs 1 through 26 hereof.

28. Third-Party Plaintiffs/Counter-Plaintiffs have a business relationship with the person or entity that actually owns their mortgage debt, including those investors who ultimately own the beneficial interest in Third-Party Plaintiffs/Counter-Plaintiffs' mortgage loan. Third-Party Plaintiffs/Counter-Plaintiffs have legal rights arising from this relationship.

29. Likewise, the owner of Counter-Plaintiffs' mortgage loan has various rights and responsibilities in connection with it.

30. Servicer has knowledge concerning the business relationship between Third-Party Plaintiffs/Counter-Plaintiffs  and the owner of their mortgage loan.  Neither Servicer nor Insuror are parties to the mortgage contracts, nor is either a third-party beneficiary.

31. Defendants intends to seek leave of Court to amend this counterclaim to assert a claim for punitive damages.

WHEREFORE, the Third-Party Plaintiffs/Counter-Plaintiffs requests the following relief:

a)  An award of compensatory damages to be determined by a jury of his peers.

b) An award of punitive damages, if appropriate after the trial and the evidence submitted during the trial, and that the court enter an amount to be determined by a jury of his peers.
c) Any equitable relief to which the Third-Party Plaintiffs/Counter-Plaintiffs may be entitled under the law.
d) Any other relief to which the Third-Party Plaintiffs/Counter-Plaintiffs might be entitled to do equity and to provide complete relief in the case.

## COUNT II - BREACH OF CONTRACT

32.  Third-Party Plaintiffs/Counter-Plaintiffs re-allege and incorporate paragraphs 1-31 above as if fully set forth herein and further allege as follows.

33. Counter- Plaintiffs have a mortgage that is serviced by Nationstar.

34. The force-placed provision from Third-Party Plaintiffs/Counter-Plaintiffs' mortgage is set forth above.

35. Third-Party Plaintiffs/Counter-Plaintiffs' mortgage requires that they maintain insurance on their property and

provides that if they fails to do so, then the servicer or lender may obtain insurance coverage to protect its interest in the property, "force place" the coverage, and charge the borrower the cost.

36. However, Nationstar charges borrower amounts for force-placed insurance that include

unearned "commissions" or kickbacks, reinsurance premiums, as well as discounted administrative, servicing, and other impermissible costs. These costs are not costs of coverage, and are not applied to protecting Nationstar's client's rights or risk in the collateral for borrower's mortgage loans.

37. Nationstar breached the mortgage agreements by, among other things, charging Third-Party Plaintiffs/Counter-Plaintiffs  the amounts beyond the actual cost of coverage.

38. Nationstar has also breached Third-Party Plaintiffs/Counter-Plaintiffs' mortgage agreements by charging Third-Party Plaintiffs/Counter-Plaintiffs for excess and unnecessary force-placed insurance coverage, including retroactive coverage, as such coverage does not protect Nationstar's client's rights in the collateral or cover their risk.

39. Third-Party Plaintiffs/Counter-Plaintiffs have suffered damages as a result of the Nationstar breaches of contract.

WHEREFORE, Third-Party Plaintiffs/Counter-Plaintiffs seek compensatory damages resulting from Nationstar's breach of contract, as well as injunctive relief preventing it from further violating the terms of the mortgage. Third-Party Plaintiffs/Counter-Plaintiffs further seeks all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT III - NEGLIGENCE

40.      Third-Party Plaintiffs/Counter-Plaintiffs re-alleges and incorporates by reference all prior factual averments of their Answer, Affirmative Defenses and the prior averments of this Counterclaim as if set out in full.

41. If the Third-Party Defendant was at any time ever legitimately acting as the representative of the true owner of the subject obligation, it would have owed the Third-Party Plaintiffs/Counter-Plaintiffs a duty to undertake the actions for which its principal had a contractual obligation to perform in a reasonable manner such that the Counterclaim Plaintiff would not be injured by its conduct.

42. Third-Party Defendant breached that duty by engaging in conduct including the application of payments in violation of the mortgage payment covenant between the Third-Party Plaintiffs/Counter-Plaintiffs and the actual owner of the loan, and causing injury and harm to the Third-Party Plaintiffs/Counter-Plaintiffs. These actions by the Third-Party Defendant caused injury and harm to the Third-Party Plaintiffs/Counter-Plaintiffs.

43. Servicer had a duty to properly and timely handle Third-Party Plaintiffs/Counter-Plaintiffs' loss mitigation request in the manner required by law. Servicer failed to comply with each and every obligation thereunder. As a result, Third-Party Plaintiffs/Counter-Plaintiffs were prevented from achieving reasonable workout options which would have ended this litigation and allowed him to be free of the stress and emotional harm of enduring the continuation of this litigation and the risk of losing his property.

44. As a result of the failure to provide notice as required, to exercise due care in the servicing of this mortgage loan before and after filing this foreclosure action, its failure to mitigate damages notwithstanding the repeated requests of Counter-Plaintiffs, and as a result of the negligent attempted acceleration of the subject loan and the bringing of this action, Counter-Plaintiffs has been damaged and Counter-Plaintiffs seek to recover their actual damages from the Third-Party Defendant pursuant to F.S. §559.77.

45. Third-Party Defendant's negligent actions and conduct as described herein have caused harm and damage to the Defendants / Counter-Plaintiffs in excess of $15,000.00

46. As a result of Servicer's negligence, Third-Party Plaintiffs/Counter-Plaintiffs have been damaged. Those damages are continuing and on-going, and are likely to occur again in the future.

WHEREFORE, Third-Party Plaintiffs/Counter-Plaintiffs demands trial by jury and the entry of judgment in the entire amount of his damages, including punitive damages, together with an award of the costs of this action.

## COUNT IV – FRAUD

47. Third-Party Plaintiffs/Counter-Plaintiffs incorporate the factual averments of their Affirmative Defenses, Third Party Claim and Counterclaim herein the same as though more fully set forth.

48. Counter-defendant's assertions that it was entitled under the law of Florida to bring this action were false and Counter-defendant was fully aware of such false allegations at the time the Counter-defendant filed this foreclosure action.

49. Counter-defendant 's claims, when it improperly commenced this action, that it was the real party in interest, that it was owed the mortgage debt, and that it had the right to accelerate the purported debt were all false, and Counter-defendant knew them to be false.

50.  Counter-defendant knew these averments to be false at the time of the filing of its amended complaint.  While ineffective, Counter-defendant attempted to avert the issue by attempting to obtain an improper, inappropriate substitution of party plaintiff, to which it knew it was not entitled.

51. Counter-defendant engages in a pattern and practice of making material misrepresentations to the court in the course of pursuit of foreclosure judgments, calculated to mislead the court.

52. Counter-defendant never had standing to pursue this action.

53. Counter-defendant has misrepresented to this court that it had the right to accelerate the mortgage loan which is the subject of this action and then to have brought this action.

54. Counter-defendant's allegations of its purported interest in the subject loan are false and were made in bad faith, as the Counter-defendant knew said allegations were false.

55. The manipulations and maneuvering by the Counter-defendant to have made the untrue representations regarding purported standing which it never had evinces its calculated intent to mislead the court and to create the appearance that it was a legitimate plaintiff with standing to have filed this action when in fact it had no standing and no right to have been a plaintiff herein.

56. The misrepresentation of the status of the purportedly subject loan is one of a series in a pattern and practice of material misrepresentations made by Counter-defendant in furtherance of its objective of misleading the court and in fact the entire justice system in order to pursue foreclosure and to obtain judgment of foreclosure although not legally entitled to do so.

57. Counter-defendant was not the proper party to file or to maintain a lawsuit for any purpose relating to the subject loan in this case when the Counter-defendant has no legal or beneficial interest to protect. Counter-defendant was fully aware that it lacked standing, and yet falsely, in collusion with its counsel, represented and attempted to document otherwise.

58. The relief requested in the Complaint was a sham.

59. The integrity of the civil litigation process depends on the truthful disclosure of facts.

60. Counter-Defendant has committed fraud.

61. The Counter-defendant's and its predecessor's lack of ownership of the subject loan at the inception of litigation herein, and Counter-Defendant's efforts and that of its counsel to

misrepresent and disguise such lack in order to make itself appear to be the proper party goes to the heart of its claim of entitlement to relief, permeates the entire proceeding and subverts the integrity of the action and the judicial process and amounts to unclean hands.

62. The Counter-defendant's efforts to misrepresent and disguise the facts surrounding the purportedly lost note its illegitimate claim is a pretense set up in bad faith and without color of fact. In fact, the note was not lost, it was merely not in the possession of the Plaintiff, because the Plaintiff was not the owner and holder thereof.

63. The entitlement to prosecute a claim in Florida courts rests exclusively in those persons granted by substantive law, the power to enforce the claim. Counter-Defendant knew at the time of the filing of the subject action that it was not so entitled, and so attempts to disguise such shortcoming with illegitimate and unfounded claims and fraudulent averments.

64. Counter-defendant could not have been unaware that it did not own the subject loan, and in fact it admits same in its' filings. Counter-defendant could not have been unaware when it sought counsel to file this action against Counterclaim Counter-Plaintiffs that it did not own the loan it sought to enforce and falsely misrepresented that it had the right to enforce.

65. Counter-defendant fabricated its purported standing to have brought this lawsuit, causing harm and damage to the Third-Party Plaintiffs/Counter-Plaintiffs in excess of $15,000.00

WHEREFORE, Third-Party Plaintiffs/Counter-Plaintiffs demand trial by jury and the entry of judgment in the entire amount of their damages, including punitive damages, together with an award of the costs of this action.

## COUNT IV DECLARATORY AND INJUNCTIVE RELIEF

66. This is an action for declaratory and injunctive relief against the Counter-defendant.

67. Counterclaim Plaintiff reasserts, incorporates and realleges the factual allegations of the Affirmative Defenses and Counterclaims hereof.

68. Counter-Defendant did not have standing to pursue the foreclosure claim that it has raised in this action at the inception thereof.

69. Counter-Defendant was neither the owner nor the holder of the subject loan documents.

70. On the date of inception of this lawsuit, the Original Plaintiff was not the owner of the subject loan, merely the servicer for a third party.

71. The Original Plaintiff must be the proper party plaintiff at the time of filing of the complaint, or it lacks standing to seek relief and lacks the standing to substitute in a substitute plaintiff.

72. Since Original Plaintiff lacked standing at the inception of this lawsuit, this court lacked subject matter jurisdiction with respect to it.

73. Even if it were the real party in interest, the Counter-Defendant would have no right to pursue this foreclosure against Third-Party Plaintiffs/Counter-Plaintiffs because the Counter Defendant has failed to provide notice of assignment pursuant to Section 559.715 et seq., Florida Statutes.

74. Third-Party Plaintiffs/Counter-Plaintiffs have never received the notice of acceleration and opportunity to cure required by the Mortgage and Note, and Counter-Defendant has improperly conspired with its secret, undisclosed assignee to assist the secret, undisclosed assignee to charge Third-Party Plaintiffs/Counter-Plaintiffs for charges which it had no right to charge, and which it knew to be excessive and outrageous.

75. Third-Party Plaintiffs/Counter-Plaintiffs had a right to receive the notices above-referenced. Failure to provide them is a bar to this action, and would preclude this action even if Plaintiff did have standing, although it does not.

76. Accordingly, Plaintiff / Counterclaim Defendant's commencement or maintenance of suit against Third-Party Plaintiffs/Counter-Plaintiffs is unlawful under any circumstances.

77. As a proximate result of the Plaintiff / Counterclaim Defendant's unlawful actions set forth herein, Third-Party Plaintiffs/Counter-Plaintiffs continue to suffer the irreparable harm described above for which monetary compensation is inadequate.

78. The Counter-Defendant has no right to pursue this foreclosure because the Original Plaintiff was not the owner and holder of this mortgage loan at the inception thereof, the true owner of the loan, whoever it is, has failed to give notice as required by law, has failed to give notice as required by the contract, has failed to provide the services it was required to provide if in fact it was the owner of the loan, has failed to properly charge and credit the Third-Party Plaintiffs/Counter-Plaintiffs' account, and has acted inequitably and in bad faith.

79. There is a substantial likelihood that Third-Party Plaintiffs/Counter-Plaintiffs will prevail on the merits of this counterclaim.

WHEREFORE, Third-Party Plaintiffs/Counter-Plaintiffs request that the Court enter a judgment pursuant to Fla. Stat. 86 declaring that:

a - the Original Plaintiff was not the owner and holder of the subject obligation, and lacked standing to have sued Third-Party Plaintiffs/Counter-Plaintiffs at the inception of litigation herein;

b - the owner of the subject obligation was legally obligated to provide the Third-Party Plaintiffs/Counter-Plaintiffs with notice of acceleration and opportunity to cure and with notice of assignment within 30 days thereof if any assignment ever took place, and that such failures are a bar to suit by any purported assignee

c - Third-Party Plaintiffs/Counter-Plaintiffs further request that this court enjoin the Third Party Defendant and Counter-defendant from conspiring with non-parties to attempt to charge foreclosure fees and costs, excessive, unreasonable and unnecessary force-placed insurance premiums and other fees and charges, and from commencing or pursuing this foreclosure, and that it award attorney's fees and for all other relief to which Third-Party Plaintiffs/Counter-Plaintiffs prove themselves entitled.

## COUNT V - ILLEGAL CONSUMER COLLECTION

80. Third-Party Plaintiffs/Counter-Plaintiffs reassert, incorporate and re-allege the factual allegations of the Affirmative Defenses and Counterclaims thereof.

81. Third-Party Plaintiffs/Counter-Plaintiffs are consumers and the purported obligation between them and the Counter-Defendant would necessarily be a consumer debt as defined in F. S. Section 559.55(1), if in fact a debt to Counter-Defendant existed at all.

82. The Counter-Defendant and its counsel have engaged in consumer collection conduct which amounts to a violation of F.S. Section 559.72(9) and Defendant / Counterclaim Plaintiffs, as a proximate result thereof, have sustained economic damages for which the  Third-Party Plaintiffs/Counter-Plaintiffs are entitled to compensation from the Plaintiff / Counterclaim Defendant, pursuant to F.S. Section 559.77.

83. The collection activities violated the Act in the following particulars:

a. The Counter-Defendant, conspiring with its counsel, is claiming, attempting and threatening to collect and enforce this purported consumer mortgage debt by this wrongful foreclosure action when the Counter-Defendant and its counsel know that Counter-Defendant has no right to do so, and that the right of Counter Defendant to pursue foreclosure does not exist;

b. The Counter-Defendant and its counsel are conspiring to commit fraud for the illicit purpose of attempting to collect and enforce this purported consumer mortgage debt by this foreclosure action when the Counter-Defendant and its counsel know that Counter-Defendant has no right to do so, and that the right to pursue foreclosure does not exist;

c. The Counter-Defendant and its counsel are using improper and unfair means and tactics for the illicit purpose of attempting to collect this purported consumer debt and to interfere with Defendant /Counterclaim Plaintiffs ability to defend against this wrongful foreclosure and to intimidate, manipulate and coerce Defendant /Counterclaim Plaintiff, including, without limitation:

(1) by communicating directly with Third-Party Plaintiffs/Counter-Plaintiffs although Counter-Defendant Third Party Defendant and its counsel know that Third-Party Plaintiffs/Counter-Plaintiffs are represented by counsel;

(2) by attempting by unfair, improper and unlawful means to avoid its obligations to Third-Party Plaintiffs/Counter-Plaintiffs to respond to

discovery propounded by Third-Party Plaintiffs/Counter-Plaintiffs to attempt to gain an unfair and improper advantage in this litigation;

d. The Counter-Defendant and Third Party Defendant have conspired with non-parties to attempt to charge and to collect illegal, excessive and unwarranted fees and charges, and then seeks to force Third-Party Plaintiffs/Counter-Plaintiffs to pay them by the bringing of this improper action;

e. The Counter-Defendant and Third Party Defendant are conspiring with secret, undisclosed non-parties to claim and to attempt to collect fees and charges including excessive and unreasonable force-placed insurance premiums, attorneys' fees, legal fees, litigation attorney fees, foreclosure costs, late charges, property inspection fees, "property valuation" charges, and other charges and advances, and predatory fees and charges although it has no right to do so.

f. Counter-Defendant continues to claim, attempt, and threaten to enforce this purported mortgage debt through acceleration and foreclosure when the Counter Defendant knows that such conduct is in bad faith because the Counter-Defendant has no rights in connection with the subject loan and does not have standing to sue Third-Party Plaintiffs/Counter-Plaintiffs; has charged and attempted to collect money from Third-Party Plaintiffs/Counter-Plaintiffs by misrepresenting to Third-Party Plaintiffs/Counter-Plaintiffs and to the court that it had the right to do so although they did not owe an obligation to Original Plaintiff; Counter-Defendant then failed to meet the contractual and statutory conditions precedent which would be required in order to enforce this purported consumer debt even if Counter-Defendant was the owner and holder thereof;

g. Notice of Acceleration and opportunity to cure was a mandatory condition precedent prior to commencing this action even if Counter-defendant had had a right to accelerate and to pursue foreclosure, although for the reasons stated therein, it did not have such right. No such notice was given to Defendant / Counterclaim Plaintiff, as a result of which this action was unlawful, even if Counter Defendant had standing, although it does not.

h. Purporting to "accelerate" the subject obligation which it had no right to accelerate, and purporting to have the right to have brought this action when it had no such right

i. Any purported owner and holder of the subject mortgage loan subsequent to the originator was obligated to give notice of assignment within thirty (30) days thereof if assignment did in fact occur; Counter-Defendant is not the originator of the subject mortgage loan, and therefore would have been obligated to give such a notice had it ever actually received assignment of the subject mortgage loan.

j. The Counter-defendant would not have a legal right to pursue this foreclosure even if it were the real party in interest because it was required to first comply, and has failed to first comply with the aforesaid conditions precedent.

k. The Counter-defendant would not have a legal right to pursue this foreclosure even if it were the real party in interest because Original Plaintiff lacked standing.

84. As a result of the failure to provide notice as required, to properly and legitimately service this mortgage loan before and after filing this foreclosure action, its failure to mitigate damages notwithstanding the repeated requests of Counter Plaintiffs/Third Party-Plaintiffs, and as a result of the unlawful attempted acceleration of the subject loan and the bringing of this action, Counter Plaintiffs/Third Party-Plaintiffs have been damaged and seek to recover their actual and statutory damages from the Third Party Defendant and from the Counter-Defendant pursuant to F.S. §559.77.

85. Counter-defendant's and Third-Party Plaintiff's improper actions and conduct as described herein have caused harm and damage to the Counter Plaintiffs/Third Party-Plaintiffs in excess of $15,000.00

WHEREFORE, Counter Plaintiffs/Third Party-Plaintiffs demand an award of damages in their favor and against the Counter-Defendant and Third Party Defendant for their actual or statutory

damages whichever is greater and for their attorney's fees and costs and for all other relief to which this Court finds Counter Plaintiffs/Third Party-Plaintiffs entitled.

## DEMAND FOR PREVAILING PARTY ATTORNEYS' FEES

86. Counter-Defendant alleges that the note and mortgage it sues under entitled it to recover its attorneys' fees related to the prosecution of this action.

87. Pursuant to the contractual reciprocal fee shifting provisions of Section 57.105(7), Counter Plaintiffs/Third Party-Plaintiffs are entitled to recover reasonable attorneys' fees if they prevail in this action.

## DEMAND FOR TRIAL BY JURY

Counter Plaintiffs/Third Party-Plaintiffs demand trial by jury on all claims, defenses and counterclaims so triable.   Further, because Counter-defendant and Third Party Defendant are not a party to the contract sued upon at any time, and in fact the subject loan belongs to a third party which is a stranger to this action, Counter-defendant and Third Party Defendant are not in privity of contract with Counter Plaintiffs/Third Party-Plaintiffs and therefore is not entitled to benefit of any contractual jury trial waiver, even if such waiver had been executed knowingly, voluntarily and intelligently, and even as to those claims which would otherwise be covered thereby.


Respectfully submitted,


/S/ *Margery E. Golant*

_____

**Golant & Golant, P.A.,**
Attorneys for Defendants, DAVID ELOWITZ
and LESLIE ELOWITZ
□  Margery E. Golant, Esquire
Florida Bar No. 44466
(For Correspondence Only)

□ Stuart M. Golant, Esquire
Florida Bar No. 789800
StuartGolant@golantlaw.com (For Correspondence Only)
□ Richard R. Widell, Esquire
Florida Bar No. 93654
RichardWidell@golantlaw.com  (For Correspondence Only)
2385 NW Executive Center Drive, Suite 100
Boca Raton, FL, 33431
Telephone: (561) 206-6171
Fax: (561) 206-6172

## NOTICE OF DESIGNATION OF EMAIL ADDRESS

Undersigned counsel, as counsel on behalf of Defendant in this matter, hereby give notice of designating an email address for receiving service.  Pursuant to Florida Rules of Judicial Administration 2.516, undersigned counsel designates the following primary email address:

**filings@golantlaw.com –For Email Service Only**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of this document was furnished via E-Mail to the person listed below on this 8th day of September 2015.

Kimberly Hopkins, Esq.
Shapiro, Fishman & Gache', LLP
4630 Woodland Corporate Blvd., Suite 100
Tampa, FL 33614
Via E-Mail: sfgbocaservice@logs.com

/S/ MARGERY E. GOLANT
_____
□ Margery E. Golant, Esquire
□ Stuart M. Golant, Esquire
□ Richard R. Widell, Esquire